**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Rachel Jernigan, | No. CV-08-2332-PHX-GMS |
| Plaintiff, | **ORDER** |
| vs. | |
| Kyle Richard, et al., | |
| Defendants. | |

Pending before the Court are: (1) Motion for Summary Judgment by Pamela Elliot, the Town of Gilbert, David Landgraf and Randy McLaws, collectively "the Gilbert Defendants" (Doc. 96), (2) Motion for Summary Judgment and Memorandum of Points and Authorities in Support Thereof by Kyle Richard ("SA Richard") (Doc. 145), (3) Motion for Partial Summary Judgment by Rachel Jernigan (Doc. 152), and (4) Plaintiff's Request to Disregard the Town Defendants' Response to Plaintiff's Statement of Additional Facts (Doc. 172). For the reasons stated below, the Court grants the Gilbert Defendants' Motion for Summary Judgment on any state or federal claims for malicious prosecution. It also grants the motion to the extent it seeks summary judgment on behalf of Defendant David Landgraf. The motion is otherwise denied. The Court grants Defendant Kyle Richard's Motion for Summary Judgment to the extent that Plaintiffs assert a *Bivens* claim against Richard arising from Plaintiff's initial arrest, detention and prosecution for the September 20, 2000 bank robbery, or the October 25, 2000 bank robbery. The Court denies the Motion as it relates to

all other claims asserted by Plaintiff. The Court grants the Motion for Partial Summary Judgment by Rachel Jernigan only to the extent that it determines that Defendant Kyle Richard is not entitled to qualified immunity. It denies the motion in all other aspects. The Court grants Plaintiff's request to Disregard the Town Defendant's Response.

**BACKGROUND**

In the year 2000, five robberies of East Valley banks were committed by an Hispanic[1] or Asian female or females with similar physical characteristics, similar dress, and using similar modus operandi. The robberies were committed on September 20 in the Town of Gilbert (robbery one), October 11 in Tempe (robbery two), October 25 in Chandler (robbery three), November 28 in Gilbert (robbery four), and November 30 in Mesa (robbery five).

Pursuant to an understanding between federal and local authorities, the perpetrator of each of the five robberies was subject to federal charges. Special Agent Richard ("SA Richard") had been the agent on call for robberies one and four, and thus was the first FBI agent to investigate the suspect or suspects in these two robberies. Because robberies two, three and five were deemed by the FBI to have been perpetrated by the same suspect or suspects, the FBI's investigation of all five of the robberies was assigned to SA Richard.

The police departments of the respective municipalities investigated each of these robberies in conjunction with the FBI. According to SA Richard, it is the common practice, when the FBI is involved in such cases, that the FBI agent, along with the case detective from the municipality, interview the victim teller. The responding police department usually handles the other interviews which are then made available to the FBI. (Doc. 130, Ex. 7B at 23).

SA Richard interviewed the victim/teller of the first robbery, Elizabeth Chlupsa, with

---

[1] As has been previously noted, "'Latina' may be the more accurate term but throughout the proceedings 'Hispanic' has been used." *United States v. Jernigan,* 492 F.3d 1050, 1051 n. 1 (9th Cir. 2007) (hereafter referred to as *Jernigan II*).

Detective Pamela Brock[2] of the Gilbert Police Department. Detective Brock is also a Defendant in this action. Gilbert Police interviewed other witnesses to the bank robbery and Detective Brock eventually completed a report. As the officer in charge for the FBI, SA Richard received copies of the witness statements and the other reports prepared by Detective Brock.

A surveillance video tape of poor quality provided some depiction of the robbery suspect. A postal inspector with whom SA Richard consulted believed that the suspect depicted in the video resembled Rachel Jernigan, with whom the postal inspector was familiar due to other investigations. With the assistance of David Landgraf running the software,[3] SA Richard and Detective Brock prepared a six-pack photo line-up that included a booking photo of Ms. Jernigan and five other persons. These persons were among those selected by a computer program used by Gilbert police as having some similar physical characteristics to Ms. Jernigan. From the photographs generated by the computer program, Brock and Richard selected the five additional candidates for the photo array.

SA Richard showed the lineup to Ms. Chlupsa. After having received an admonition regarding eyewitness identification, and observing the card for between twenty and forty-five seconds, Ms. Chlupsa picked out Ms. Jernigan's picture in the line-up. In doing so Ms. Chlupsa indicated that she "really [felt] like it's her." When asked how strongly she felt about it, she responded "I really feel confident." (Doc. 97, Ex. A at TOG000147; *Id.*, Ex. D at S-B-O 000161).

Based on Ms. Chlupsa's identification, SA Richard and an Assistant United States Attorney obtained a federal indictment against Ms. Jernigan for the Gilbert robbery that was issued on October 11. (Doc. 97, Ex. M). On that same date, a second similar robbery occurred in Tempe. Although the suspect was not described as wearing a baseball cap,

---

[2] Detective Brock, since married, is now Pamela Elliott. To avoid confusion, she is hereafter referred to as either Brock or Detective Brock since that was her name at the time.

[3] Officer Landgraf is also a Defendant in this case.

1   otherwise the general description of the suspect, the clothes that she was wearing, and the
2   method used to rob the bank were similar to the Gilbert robbery. The FBI quickly determined
3   that both robberies were likely committed by the same person and followed its usual practice
4   of reassigning the Tempe bank robbery from Special Agent Mesick to SA Richard. This
5   reassignment took place on the same date that the second robbery occurred. (Doc. 97, Ex. L
6   at KR-645). SA Richard thereafter took over the case, and conducted, among other things,
7   follow-up interviews with Ms. Ward the victim/teller.

8   Despite the FBI's determination that the robbery was likely committed by the same
9   suspect, when Special Agent Mesick showed Ms. Ward the same photo line-up that had been
10  shown to Ms. Chlupsa, she did not recognize anyone depicted in the photos as the woman
11  who robbed her. (*Id.* at KR-395). A few days later, when a Gilbert police officer showed Ms.
12  Ward the surveillance photo taken of the robbery suspect in the Gilbert robbery, she
13  indicated to SA Richard that she was "pretty sure" she had been robbed by the same person.
14  (Doc. 130-3, Ex. 22 at S-B-0 002390-91). She indicated that the person depicted in the
15  surveillance video and the person who robbed her were the same height, they both had a full
16  face, and they both had short dark hair. (*Id.*, *see also Id.* at 00473).

17  Two weeks later, on October 25, a third similar bank robbery occurred in Chandler.
18  The descriptions of the suspect given by the witnesses again generally matched the
19  descriptions given of the suspect in the Gilbert and Tempe robberies. In light of the distinct
20  similarities, when the case was opened it was officially assigned to SA Richard. (Doc. 130,
21  Ex. 7B at 16). Once assigned to the case, SA Richard traveled to Ms. Etherington's home on
22  the day of the robbery and showed her the same photo six-pack containing Ms. Jernigan that
23  had been show to Ms. Chlupsa and Ms. Ward. After studying the line-up card for about
24  twelve minutes, Ms. Etherington selected Ms. Jernigan as being the person who robbed her.
25  She thought "[t]he shape of her face is right, kind of rounded, and came to a point. The eyes
26  look very similar." (Doc. 97-2, Ex. D at S-B-0 000156; Doc. 97-4, Ex. L at KR-453).

27  On November 10, 2000 Ms. Jernigan was arrested and taken into custody. (Doc. 97-4,
28  Ex. L at KR-574-79). She was detained and was thus in custody when two distinctly similar

additional robberies occurred in quick succession.

On November 28, a fourth similar robbery of another bank in Gilbert occurred directly across the intersection from the location of robbery one. SA Richard was the agent on call for the FBI. Detective Brock was not assigned to this investigation. Instead, Detective Ross Estavillo, also a detective with the Gilbert Investigations-Persons Crimes Unit was assigned. Witnesses again gave the same general description and MO of the suspect that had been given for the first three robberies.

Two days later, on November 30, a fifth similar robbery occurred in Mesa. Again, the physical description of the robber was indistinct in general terms from the physical description of the robber given for robbery numbers one through four. The description of the modus operandi was similar to certain aspects of those robberies. The suspect was described as fleeing the scene in a dark Toyota 4Runner with gold trim—the same description given of the getaway car in robbery two. The FBI reassigned SA Richard to the file after having determined that the November 30 robber was committed by a serial robber. (Doc 165-1, Ex. B at 289).

Witnesses to all of the robberies generally described a short woman in her late twenties or early thirties who was either Hispanic or Asian, with pulled back black hair,[4] indicating, at best, a statistically uncommon bank robber.[5] The perpetrator dressed in jeans and a blue jacket, sweatshirt or long sleeved shirt, often with a shirt underneath.[6] The witnesses from the first five robberies described the robber as waiting her turn in the teller

---

[4] Witnesses to robberies one through four independently mentioned that the robber's hair was pulled back. No witness to robbery number five mentioned how the robber wore her hair.

[5] Relatively few bank robbers are either female or Hispanic. When both characteristics are combined, the bank robber is, as all parties agree, statistically rare.

[6] Witnesses to robbery three provided no extensive description of the robber's clothing. The description of the perpetrator's clothing from the other bank robberies are consistent with the above description. Witnesses to the robberies frequently described the perpetrator as wearing a blue hooded sweatshirt.

line and then, when arriving at the teller, presenting her demand in a note that she gave to, but did not leave with, the teller. Witnesses described the notes as having been written on white lined paper that was folded or crumpled.

Multiple witnesses to robbery two and a witness to robbery five independently described the vehicle in which the robber fled the scene as a dark or black Toyota 4Runner with gold trim.[7] Witnesses to robberies one, four and five described the perpetrator as having a "casual pretty appearance" or as being "cute"[8] and also as having a blemished or pock-marked complexion.[9] Witnesses to robberies two and four separately described their robber

---

[7] In robbery two, witnesses Pugh (Doc. 97-4, Ex. L at KR-399) ("a black Toyota 4-Runner, possibly a "limited" edition, with a lighter color trim around the bottom of the car"), Ophardt (*id* at KR-400) ("black Toyota 4-Runner"), Mills (*id.*) ("Toyota 4-Runner, late 90's model, black in color with gold trim on the back of the truck"), and Johnson (*id.*) ("black Toyota 4-Runner or Mitsubishi Montero with chrome wheels and tinted windows"), all described such a vehicle. Thomas O'Brien, a witness to the fifth robbery, described the perpetrator as leaving in "a newer SUV (Toyota 4 Runner) dark color, gold trim." (Doc. 130-3, Ex. 30).

[8] Ms. Chlupsa, the teller during robbery one, stated that the robber "doesn't look like [she's] off [the] streets, kind of pretty, clean." (Doc. 130-3, Ex. 21-J at FBI388-89). Gabrielle Emmons, the teller during robbery four described her as "very clean, not a street person or drug addict." (Doc. 97-4, Ex. L at KR-913). She looked "cute" and "didn't look homeless or like a junkie." (Doc. 130-3, Ex. 21-J at FBI000996). Allison Williams, the teller during the robbery five described the robber to SA Richard as "cute." (Doc 165-1, Ex. B at 289–95; *id.* at FBI001099).

[9] Ms. Hawley, a witness to robbery one, described the perpetrator as having a blemished complexion. (Doc. 97-2, Ex. A at TOG000135). Ms. Emmons, the teller in robbery four, described the perpetrator as having **"**a little acne." (Doc. 97-4, Ex. L at KR-913, 943). Ms. Williams, the teller in robbery five, described the robber as having a "pot-marked [sic] face" and having small pitted marks in her complexion. (*Id.* at KR-990) ("The suspect had small-pitted marks on both of her cheeks."). Ms. Chlupsa, the victim/teller of robbery one, testified at the March 2001 trial of Ms. Jernigan that the robber "may have had acne," or been "kind of pocked." (Doc. 130-1, Ex. 8E at 121). Nevertheless, despite her avowal in her current affidavit to the contrary (*see* Doc. 130-2, Ex. 10 ¶ 6), neither the report she filled out immediately after the robbery (Doc. 97-2, Ex. A at TOG000131-32), nor the contemporaneous notes of the officers interviewing her (*id.* at TOG000122-23; Doc. 130-3, Ex. 21-J at FBI000387-89), suggest that she told them at the time that the robber had a blemished complexion.

1    as having a facial appearance "like she just woke up."[10]

2         While in general most witnesses to the robberies described the perpetrator as Hispanic,

3    others described her as Asian. For example, individual witnesses to the September robbery,

4    as well as both November robberies, indicated that they would describe the perpetrator as

5    being either "Hispanic or Asian."[11]

6         The handwriting on the note for robberies one, two and four was independently

7    described by witnesses as "messy," "flowing" and "sloppy."[12]

8         Despite the general and specific similarities in the descriptions of robberies four and

9

10   _____

11   [10] Kerry Ward, the victim teller in robbery two, indicated that the perpetrator "looked
     like she just woke up." (Doc. 97-4, Ex. L at KR-396). Boyd M. Denetedeel, a witness to
12   robbery four, described the perpetrator's "face as being 'stretched' in appearance, as though
     she had just woke up." (*Id*. at KR-932).

13
     [11] *See*, *e.g.*, the descriptions of Ms. Chlupsa (Doc. 97-2, Ex. A at TOG122) ("Hispanic
14   possibly Asian female"), and Yarjanic Nath for robbery one (Doc. 97-4, Ex. L at KR-174)
     ("Hispanic or Filipino"), Holly Ophardt of robbery two (Doc. 187, Ex. 9k) ("Hispanic or
15   Oriental"), Gabrielle Emmons and Robert Denetedeel of robbery four (Doc. 97-5, Ex. L at
     KR-913) ("Hispanic or Oriental" ); (*id*. at KR-943) ("a Hispanic or Hawaiian female"); (*id*.
16   at KR-932) ("an Asian or Hispanic female"), and Allison Williams of robbery five (*id*. at
     KR-1009) ("she said she appeared to be Hispanic, but may of [sic] just been dark skinned").
17

18   [12] Ms. Chlupsa described the note from robbery as being "messy—girls writing."
     (Doc. 97-2, Ex. A at TOG000122; Doc 130-3, Ex. 21-J at FBI000387) ("big letters messy
19   handwriting"). Ms. Ward described the note in robbery two as being written in "'bubbly' or
     flowing," handwriting with "large letters similar to a teenage girl's handwriting." (Doc. 97-4,
20   Ex. L at KR-395); (Doc 130-3, Ex. 21-J at FBI00557) ("Large letters - 'Flowing writing
     'teenage girl writing'"); (*id*. at S-B-0 2382) ("being in the style 'a teenage girl' would
21   write"); (*id*., Ex. 22 at S-B-0 002388) (same). Ms. Emmons described the note from robbery
     four as being "very sloppy and in paragraph form." (Doc. 97-4, Ex. L at KR-912, KR-942);
22   (Doc. 130-3, Ex. 21-J at FBI000994) ("full line letters"; "probably print"; "really sloppy");
     (*id* at S-B-0 001018) ("very sloppy writing and paragraph form"). By contrast, Colette
23   Etherington (October 25, Chandler) described the letters as being printed and approximately
     one inch in size. (Doc. 97-4, Ex. L at KR-428); (Doc 130-3, Ex. 21-J at FBI000685) ("printed
24   letters 1 in. tall"); (*id*. at S-B-O 2437) ("printed neatly in approximately one inch tall
     letters"); (*id*. at S-B-0 002460) ("printed on the note and were approximately one inch in
25   size."). Allison Williams apparently provided no description of the handwriting in the note
     used in robbery five.
26

27

28

five to robberies one through three, SA Richard testified that he and other law enforcement agencies concluded after "thoughtful consideration" that one person committed bank robberies one through three, and a separate person committed robberies four and five. (Doc. 97-3, Ex. G at S-B-O 3779).

On January 2, 2001, SA Richard testified before the grand jury for the purpose of obtaining a superceding indictment charging Ms. Jernigan for robberies two and three as well as robbery one. (Doc. 97, Ex. N). In seeking the superceding indictment, SA Richard did not disclose to Ms. Jernigan's counsel, the grand jury, or the Assistant United States Attorney who was seeking the superceding indictment, that after the arrest and detention of Ms. Jernigan for robbery one in early November, two similar bank robberies had occurred in Gilbert and Mesa, by a similarly described suspect, and that these bank robberies had features that identified them with the first three robberies.

Although video surveillance was available for robbery four that provided a somewhat clearer image of the perpetrator than the surveillance footage from robbery one, SA Richard did not show those surveillance photos to any of the witnesses to robberies one through three. Nor, apparently, did he show the victims of robberies four and five the six-pack card photo array featuring Ms. Jernigan.

Beginning in mid-February, a month before Ms. Jernigan's trial, SA Richard, in combination with Detective Brock, went back to four of the witnesses to robbery one who had less exposure to the robber than had Ms. Chlupsa, the teller. On February 14, 2001 SA Richard returned to the bank and showed Yaranjic Nath and Kathleen Golliher the original six-pack from which Elizabeth Ms. Chlupsa had identified Ms. Jernigan. Detective Brock joined SA Richard at some point during his interview with Kathleen Golliher. Six days later, on February 20, Detective Brock showed Donavon Grierson the original six pack photo array. On March 19, two days before her trial testimony, both SA Richard and Detective Brock showed Elizabeth Hawley the original six pack photo array. All four identified Ms. Jernigan from the six-pack card, and they all subsequently identified her as the perpetrator in their trial testimony.

Prior to trial, Ms. Jernigan moved to suppress Ms. Chlupsa's identification because the six-pack photo array was overly suggestive. The trial court held an evidentiary hearing and denied the motion. It severed for trial each of the three separate bank robberies with which Ms. Jernigan was charged in the superceding indictment, and set trial for robbery one in March 2001.

At trial, the prosecution introduced the photo line-up into evidence and Detective Brock and SA Richard testified about the process used in the creation of the photo line-up. Ms. Chlupsa testified and identified Ms. Jernigan as the bank robber, as did Nath, Golliher, Grierson and Hawley. The prosecutor also played the bank's surveillance tape of the robbery. Ms. Jernigan argued that the identifications were in error, but was unaware of evidence of similar bank robberies being conducted by persons of similar description and modus operandi that had occurred after she was taken into custody. The jury convicted Ms. Jernigan for committing robbery one.

Ms. Jernigan appealed her conviction. Two months after her conviction, in light of the conviction, the United States dismissed, without prejudice, counts three and four of the superceding indictment which were the counts relating to robberies two and three. (Doc. 97, Ex. BB).

Seven months later, on December 11, 2001, a sixth similar robbery occurred at the same Bank of America branch that had been the subject of robbery one. The perpetrator was again a short Hispanic/Oriental female.[13] Like robberies one through five, witnesses to robbery six described a short woman in her late twenties or early thirties who was either Hispanic or Asian, with pulled back black hair. As with robberies one and two, the robber pulled a gun out of her purse and pointed it at the victim teller. As with robberies one, four

---

[13] In the report taken at the scene, Kathy Golliher is recorded as describing the robber to Detective Palmer as being "oriental in appearance." (Doc. 97, Ex. L. at KR-1090). In her conversations with Agent Richard several weeks later, and after Rodriguez-Gallegos's arrest, she described her as Hispanic. (Doc. 97, Ex. L at KR-1033). Witness McMullen also described the perpetrator to Officer as being "possibly of hispanic or oriental origin." (*Id*. at KR-1089).

1   and five, witnesses to the robbery described the perpetrator of robbery six as being "quite

2   attractive," and as having a blemished complexion. (Doc. 97-5, Ex. L at KR-1064). Similar

3   to the previous robberies, the perpetrator was described as being dressed in jeans and a

4   zippered blue sweat shirt.

5        After the robbery, a bank employee chased the suspect eastbound through the parking

6   lot into the parking lot of the strip mall. She witnessed the suspect get into a white Isuzi

7   Rodeo with Arizona license plate 150-GRM. (Doc. 97-5, Ex. L at KR1049, 1058-59). Police

8   were able to subsequently apprehend the vehicle. When apprehended, the suspect, Juanita

9   Rodriguez-Gallegos, had in her possession the bait bills given to her when she robbed the

10   bank. Ms. Rodriguez was arrested. The Gilbert Police Department conducted the

11   investigation in which Detective Brock, who had transferred departments by this time, played

12   no role.

13        Although the FBI assigned SA Richard to investigate the robbery, he did not respond

14   to the scene on the day that the robbery occurred. He did, however, subsequently investigate

15   the crime and arranged for the filing of federal charges. As the FBI agent assigned to the

16   investigation, SA Richard received all of the reports prepared by the Gilbert Police

17   Department.

18        After the arrest, Sergeant McLaws, the supervisor of the Investigations-Persons Crime

19   Unit at the Gilbert Police Department, advised Detective Palmer that the suspect's physical

20   appearance was similar to the description given by witnesses of the perpetrator of robbery

21   four. He made no mention of the similar physical appearance to the perpetrator of robbery

22   one, which occurred in the same bank. Detective Palmer researched the file for robbery four

23   and two days later met with Gabrielle Emmons, who was the teller during that robbery. When

24   Sgt. Palmer showed Ms. Emmons a line-up card that contained a photo of Ms. Rodriguez-

25   Gallegos, Ms. Emmons identified her as the robber, circled her photograph and signed the

26   line-up card. Five days later, Detective Palmer met with SA Richard, and, at SA Richard's

27   request, gave him the photo line-up card signed by Gabrielle Emmons. SA Richard advised

28   Palmer that the FBI would be filing charges against Rodriguez-Gallegos for robbery four.

(Doc. 97-5, Ex. L at KR-948-49).

SA Richard subsequently either showed, or arranged for others to show, the line-up card to Allison Williams, the teller in robbery five. Ms. Williams also identified Rodriguez-Gallegos as her robber. (Doc. 97-7, Ex. DD at S-B-0 001016). The next month, Rodriguez-Gallegos was indicted on charges of committing robberies four, five and six. She subsequently entered into a plea agreement in which she admitted committing those robberies but only pled guilty to the charge of using a firearm during the course of robbery six. (Doc.97-3, Ex. G at SBO 3730-3731, 3775).

There is no indication that Sgt. McLaws or SA Richard raised with Detective Palmer the similarity of Ms. Rodriguez-Gallegos to the perpetrator of robbery one. Richard never investigated whether Rodriguez-Gallegos committed any or all of the robberies attributed to Ms. Jernigan, nor did he ever disclose to the AUSA who prosecuted Ms. Jernigan or the AUSA who prosecuted Ms. Rodriguez-Gallegos the similarities between robberies one through three and robberies four through six.

Ms. Jernigan's conviction for the September 20, 2000 robbery was affirmed on appeal in August, 2002.

Eventually Rodriguez-Gallegos was assigned to the same prison complex that housed Ms. Jernigan. When Ms. Jernigan heard of Rodriguez-Gallegos's arrest and conviction for the similar robberies, she sought relief from her conviction based on the government's failure to disclose the subsequent similar robberies committed by Rodriguez-Gallegos.

The Court granted an evidentiary hearing on this motion on May 12-13, 2004. SA Richard was the only witness to testify at this hearing. In addition to SA Richard's testimony, evidence was admitted including photo stills from the surveillance videos taken of robbery one and four, individual booking photographs of Rachel Jernigan and Juanita Rodriguez-Gallegos, the six-pack photo lineup from which some witnesses had identified Ms. Jernigan, and a statement from Kathleen Golliher opining that the robberies were committed by two separate women.

After considering the testimony and the evidence, the trial judge denied Jernigan's

Motion for a New Trial. His ruling was affirmed by a divided panel of the Ninth Circuit, *United States v. Jernigan,* 451 F.3d 1027 (9th Cir. 2006) (hereafter *Jernigan I*), but was ultimately reversed by a 13-2 *en banc* panel in *Jernigan II. United States v. Jernigan,* 492 F.3d 1050 (9th Cir. 2007).

During a subsequent interview in prison in 2008, Gallegos confessed, in addition to the three robberies to which she had already admitted, to robbery one, robbery two and maybe one other robbery, the location of which she could not remember. She stated that she brought her gun with her on all of her robberies although it was unloaded.  She further admitted to using a black Toyota 4Runner as a vehicle during at least the first three of her robberies.

The United States ultimately dismissed the indictment against Ms. Jernigan for robbery one. She was released after she had been incarcerated for approximately seven years and three months.

### ANALYSIS

In counts one and two of her complaint, Plaintiff brings § 1983 claims against Defendants McLaws, Brock, Landgraf and Richard for *Brady* violations, *Brady v. Maryland,* 373 U.S. 83 (1963), and for malicious prosecution. At oral argument, however, Plaintiff conceded that she stated no claims against SA Richard in Counts One and Two and that she has abandoned any conspiracy claims filed in her complaint. As a result, Plaintiff's *Bivens* claims against SA Richard for *Brady* violations and malicious prosecution are contained in counts four and five of her complaint.[14] At oral argument, Plaintiff also conceded that any

---

[14] Section 1983 authorizes recovery only against state officials who violate federal rights under the color of state law. Thus the 1983 claims asserted in Counts One and Two can be stated against Brock, McLaws, and Landgraf only. The Supreme Court, however, has established a private right of action against federal officials who violate federal rights of those entitled to them. *See Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388 (1971). Therefore, the claims against SA Richard in Counts Four and Five are appropriately denominated as *Bivens* claims. The law governing section 1983 claims and *Bivens* claims is virtually identical. *See Van Strum v. Lawn,* 940 F.2d 406, 409 (9th Cir. 1991) (holding that "[a]ctions under Section 1983 and those under *Bivens,* are identical save for the replacement

1  supervisory liability claims she brought against McLaws in Count Three are not distinct from

2  the claims she asserts against him in Counts One and Two. Count Three is therefore

3  dismissed.

4          In Count Six, Plaintiff asserts a state malicious prosecution claim against all

5  Defendants including the Town of Gilbert based on the assertion that the Town of Gilbert is

6  vicariously liable for the malicious prosecution committed by its police officers.

7  **I.    *Brady* Claims against the Defendants**

8          To provide due process, the government has a constitutional obligation to disclose to

9  a criminal defendant before trial material, exculpatory evidence known to it. *Brady v.*

10 *Maryland,* 373 U.S. 83 (1963). While the exculpatory information of which the government

11 is aware must be turned over prior to trial, the government may not consider accruing

12 evidence in a criminal investigation on a piecemeal basis. *Kyles v. Whitley*, 514 U.S. 419, 437

13 (1995) (holding that the government must gauge the likely net effect of all undisclosed

14 evidence "and make disclosure when the point of 'reasonable probability' is reached");

15 *United States v. Bagley*, 473 U.S. 667, 682–84 (1985) (holding that exculpatory evidence is

16 material "if there is a reasonable probability that, had the evidence been disclosed to the

17 defense, the result of the proceeding would have been different"). As a result, information

18 that may be deemed immaterial upon original examination may become material as

19 additional evidence is uncovered. *Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987) (holding

20 that "the duty to disclose is ongoing; information that may be deemed immaterial upon

21 original examination may become important as the proceedings progress"). Accruing

22 information in a criminal investigation may make some information exculpatory that was not

23 originally so perceived. And the obligation to evaluate whether accruing information is

24 exculpatory, and to disclose such information, continues even after conviction. *Tennison v.*

25 *City & County of San Francisco,* 570 F.3d 1078, 1094 (9th Cir. 2009) ("The *Brady* duty to

26

27 of a state actor under Section 1983 by a federal actor under *Bivens*"). *See also Graham v.*

28 *Connor,* 490 U.S. 386, 394 n. 9 (1989) (same).

disclose is ongoing and extends to all stages of the judicial process, before trial, during trial and after conviction; failure to do so is a violation of the judicial process."); *Broam v. Bogan,* 320 F.3d 1023, 1030 (9th Cir. 2003) ("A prosecutor's decision not to preserve or turn over exculpatory material before trial, during trial, or after conviction is a violation of due process under [*Brady*]."); *Leka v. Portundo,* 257 F.3d 89, 100 (2d Cir. 2001) (stating that "*Brady* requires disclosure of information that the prosecution acquires during the trial itself, or even afterward"); *Smith v. Roberts,* 115 F.3d 815, 829 (10th Cir. 1997) (agreeing with the state's concession that the *Brady* "duty to disclose is ongoing and extends to all stages of the judicial process" where the evidence arose after trial but during direct appeal.)

Defendants acknowledge, as they must, that the Ninth Circuit has already held that the government committed a *Brady* violation in failing to disclose to Ms. Jernigan the exculpatory evidence regarding the subsequent similar robberies that occurred after she was in custody. *See Jernigan II*, 492 F.3d at 1057. Defendants, however, move for summary judgment on several related grounds. First, they assert that Plaintiff cannot demonstrate that any Defendant acted with the deliberate indifference to her rights that is required for Plaintiff to make out a § 1983 claim or a *Bivens* claim for a *Brady* violation. Second, they assert that they are entitled to qualified immunity for several different reasons. Each of these arguments will be addressed in turn.

## II.   Deliberate Indifference

To successfully bring a § 1983 claim, Plaintiff must establish that each Defendant has "acted with deliberate indifference to or reckless disregard for an accused's rights or for the truth in withholding evidence from prosecutors." *See Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1948 (2009) (Plaintiff must establish "that each Government-official defendant, through the official's own individual actions, has violated the Constitution"); *Tennison,* 570 F.3d at 1088 ("[A] § 1983 plaintiff must show that police officers acted with deliberate indifference to or reckless disregard for an accused's rights or for the truth in withholding evidence from prosecutors."). Plaintiff "must set forth specific facts as to each individual defendant's deliberate indifference." *Leer v. Murphy,* 844 F.2d 628, 634 (9th Cir. 1988). Moreover, "[t]he

inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Id* at 633.

On a motion for summary judgment, therefore, the Plaintiff must put forth facts that would allow a reasonable jury to find that he or she acted with at least "deliberate indifference" to the Plaintiff's rights. "A fact issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002). Plaintiff has successfully done so here with each of the Defendants with the exception of David Landgraf.

### A.     SA Kyle Richard

The defendants in each of the six robberies at issue in this case were charged in federal court. Each of the six robberies was either resolved by a federal plea agreement or dismissed without prejudice in light of earlier convictions. The FBI was the lead federal agency investigating these crimes. Defendant Kyle Richard was the agent in charge of investigating all six of the bank robberies for the FBI. (Doc. 97, Ex. G. at S-B-O 003710 and 003711).

As the FBI case agent for each of these six robberies, Agent Richard conducted interviews and actively participated in the investigations—particularly the interviews of the victim/tellers. SA Richard had copies of all of the investigative files prepared by the municipal police departments including the interviews of other witnesses they conducted. He reviewed all the witness statements. He further acknowledges that he was well aware of his obligation to turn over any evidence that exculpated Ms. Jernigan.

SA Richard obtained an indictment for Ms. Jernigan for the first robbery and took custody of her after she was arrested on November 10, 2000. After Ms. Jernigan's detention, he immediately became aware of, and was assigned to investigate, robberies four and five. Both robberies four and five occurred within a few weeks of robbery number three, and all five robberies occurred within approximately a two month period. Both were in the same general region as robberies one through three. Both were committed by a woman whose

physical description including race, age, appearance, and clothing were similar to the witness descriptions given of the perpetrator(s) of robberies one, two and three.

Further, the independent witness descriptions of the perpetrator of robbery numbers four and five had additional and independent similarities with the witness descriptions of the perpetrator of robberies one and two. The perpetrator or perpetrators of robberies number one, four and five were all similarly described by witnesses as "pretty" or "cute." Witnesses to these same robberies described their perpetrator as having a blemished complexion. Witnesses to robberies number two and four independently described the perpetrator of their respective robberies as having a facial appearance that made it look "like she just woke up." Witnesses to robberies two and five independently described the perpetrator's car as a dark Toyota 4Runner with gold trim. SA Richard was aware that the teller in robbery two did not identify Ms. Jernigan as her bank robber, yet she believed that the person who robbed her was also probably the same person who committed robbery one. The FBI believed the same thing.

In light of the similar descriptions of the five robberies, SA Richard asserted in previous testimony that he and other law enforcement personnel "thoughtfully considered" whether the perpetrator of the subsequent robberies could be the same as the perpetrator for robbery one for which he had already charged Ms. Jernigan. However, he did not disclose to Ms. Jernigan or to her prosecutor the similarities in those robberies. He also did not show witnesses to robberies one through three available surveillance photos of the suspect for robbery four. However, he did, thereafter, testify at the grand jury in support of obtaining a superceding indictment charging Ms. Jernigan with robberies two and three without disclosing the occurrence of robberies four or five to anyone.

Shortly prior to Ms. Jernigan's trial on robbery one, SA Richard sought out additional witnesses to robbery one and showed them the original photo six-pack containing Ms. Jernigan's photo. He did not show these witnesses the surveillance photos of the suspect from robbery four.

When, nine months later, Juanita Rodriguez-Gallegos was arrested for robbing the

same bank that Ms. Jernigan had been convicted of robbing, SA Richard was assigned the case by the FBI. Ms. Rodriguez-Gallegos was convicted on federal charges for that crime. Ms. Rodriguez's description matched that given by witnesses of the perpetrator of robberies one through five, and the details of the robbery matched many details of the previous five robberies. SA Richard was informed by Detective Palmer that he had shown the victim/teller of robbery four, that had occurred a year earlier, a six-pack photo array that contained Ms. Rodriguez-Gallegos. That witness, Ms. Emmons, identified Ms. Rodriguez-Gallegos as her bank robber. SA Richard was aware that the victim/teller of robbery five also identified Ms. Rodriguez-Gallegos as her robber.

He did nothing to show a photograph of Ms. Rodriguez-Gallegos to any of the witnesses to robberies one through three, or to disclose to Ms. Jernigan or her prosecutor the arrest of Ms. Rodriguez-Gallegos, the three similar bank robberies occurring after her arrest, or the identification of Ms. Rodriguez-Gallegos as the perpetrator of the last three of those robberies.

Even though Ms. Jernigan was convicted of robbery one in March 2001, SA Richard had a continuing obligation to disclose exculpatory information of which he became aware. *See, e.g, Tennison,* 570 F.3d at 1094; *Broam,* 320 F.3d at 1030. When, years later Ms. Jernigan independently discovered that Rodriguez-Gallegos, who had the same general physical condition as she did, had been convicted for committing similar crimes at the same time and in the same general area, she moved for a new trial. SA Richard was the only witness to testify at the hearing on that motion. As will be demonstrated in additional detail, in his testimony he made factually inaccurate statements that wrongfully tended to implicate Ms. Jernigan in robbery one. He further testified that distinctions in the witnesses' descriptions resulted in a consensus among law enforcement officers that there were two distinct perpetrators of the six robberies, one perpetrator for robberies one through three and another perpetrator for robberies four through six. However, a careful review of the witness statements to the robberies demonstrates that all of the purported distinctions to which he testified are illusory. Further, he offers no admissible evidence that there was any such

consensus within the FBI or among the any local law enforcement agencies which may have been investigating the robberies.

Based on the above evidence and law, a reasonable jury could find that SA Richard not only acted with negligent indifference or reckless disregard with respect to Ms. Jernigan's rights, but that he intentionally deprived her of her right to due process to avoid calling into question her guilt for robbery one.

### B.   Detective Brock

There are possible factual disputes which a reasonable jury could resolve to find that Detective Brock was aware of the exculpatory facts pertaining to Ms. Jernigan, that she should have disclosed them, and that she was deliberately indifferent to Ms. Jernigan's rights in failing to do so. The Town correctly asserts that Detective Brock cannot be liable under § 1983 for conducting a negligent investigation. Nevertheless, Detective Brock was the Town officer charged with the investigation, and a reasonable jury could conclude that she knew of facts that were exculpatory as to Jernigan that she did not disclose. The question thus presented is not what Detective Brock did not know that she should have known, but whether Detective Brock knew exculpatory facts that she failed to disclose. Because there are material issues of fact as to whether Detective Brock knew of material exculpatory evidence that she did not disclose, Ms. Jernigan's 1983 claim is for more than a negligent investigation, and summary judgment will not be granted to Detective Brock on this basis.

It is undisputed that Detective Brock was the Gilbert "detective assigned to" the investigation of robbery one. In that capacity, she prepared a crime bulletin describing the suspect and containing a surveillance photo of her which she distributed to other local police departments in the area. This crime bulletin would have been posted in the Gilbert Police Department patrol report writing room and/or placed in the briefing book.

As the assigned investigator, Detective Brock prepared the report and supplements concerning the investigation. Detective Brock was supplementing her report and her investigation, and did not complete it, until at least mid-February of 2001. During the time of her investigation, Brock became aware of robbery two in Tempe. She also became aware

that the teller/victim of that bank robbery believed that the perpetrator was the same person that had committed robbery one.

Robberies three through five, including robbery four in Gilbert, also occurred during the period in which Brock was still investigating and writing her report on robbery one. SA Richard, the same FBI agent who was working with her on robbery one, was assigned to investigate all of these subsequent robberies in both Gilbert and other municipalities. He testified that to the extent he had communication with the Town throughout his investigation of robbery one, he spoke principally with Detective Brock. Detective Brock was not assigned to investigate robbery four, but Detective Estavillo, another officer from the Investigations-Persons Crime Unit, was. The Investigations-Persons Crime Unit was charged with, among other things, investigating bank robberies within the Town. That unit consisted of five or six people and was housed in a trailer north of the Gilbert Police Station. It was a very small closed environment. Sergeant McLaws, the supervisor of the unit, testified that "[j]ust the size [of the unit] would lend to the exchange of information." What appear to be admissible statistical compilations indicate there were only two bank robberies in Gilbert in the year 2000. The jury could, on such evidence, reasonably conclude that bank robberies one and four were the only bank robberies that occurred in the Town of Gilbert in that year.

Further, robbery four took place directly across the intersection from robbery one. Estavillo created a Crime Bulletin for robbery four that described the similar suspect and which was posted in the patrol report writing room and placed in the briefing book. Brock acknowledges that the detective trailer and the patrol report writing room were 50 feet apart, and she did go into the patrol report writing room during this period. As such, a reasonable jury could conclude that Brock was aware of the details of robbery four and that to the extent she was aware of it, she was also aware of its exculpatory value in the investigation of robbery one. *Reid v. Simmons,* 163 F. Supp. 2d 81, 91 (D.N.H. 2001) (holding that "[t]o be sure, there may be cases in which a police officer is aware of evidence located in a separate investigative file that is so patently exculpatory . . . that it may fairly be inferred that the officer fully appreciated its legal significance in the case at hand").

There are facts from which a reasonable jury could conclude that Detective Brock was aware of more than just robberies one, two and four. SA Richard testified that there was a weekly robbery meeting occurring throughout this period that was located at the Phoenix Police Department to which all the local police departments sent representatives. He testified that Ms. Jernigan and robberies attributed to her (robberies one through three) were thoughtfully considered and compared with subsequent robberies by the law enforcement agencies involved. (Doc. 97, Ex. G at S-B-O 003790).

Further, Detective Brock continued to investigate or assist in the investigation and prosecution of Jernigan well after the commission of robberies four and five. Prior to trial, in February 2001 Detective Brock assisted SA Richard in photographing various areas of the bank. Her photos were subsequently released to the FBI to analyze the height of the perpetrator. On February 14, 2001, SA Richard interviewed bank employees Nath and Golliher at the Bank of America branch that had been robbed. Brock was present with Richard during part of Richard's interview of Golliher. The next day, Brock and Richard testified at the hearing on Ms. Jernigan's motion to suppress the identification of Ms. Chlupsa. Five days later Brock showed the six-pack photo array for the first time to Donovan Grierson—another witness to robbery one. The next month, a day before Ms. Jernigan's trial began, Brock accompanied Richard to show the six-pack photo array for the first time to witness Elizabeth Hawley. Detective Brock and SA Richard further testified at Ms. Jernigan's trial.

To the extent that Brock and Richard continued to work on this investigation throughout this period, a jury would not be unreasonable in concluding that Brock acquired knowledge of the existence of the other similar robberies that Richard was investigating and with which Jernigan was charged, in addition to the similar robberies with which she was not charged.

To the extent that Brock asserts that she was unaware of these robberies or their details, that does not entitle her to summary judgment when there is evidence in the record from which a reasonable jury could conclude otherwise. *Villiarimo v. Aloha Island Air, Inc.,*

282 F.3d 1054, 1061 (9th Cir. 2002) (holding that uncorroborated and self-serving testimony does not create or negate a genuine issue of fact). Therefore she is not entitled to summary judgment on her assertion that there are no material facts raising a question as to whether she violated Ms. Jernigan's constitutional rights.

### C.   Sergeant Randall McLaws

A supervisor may be liable for a subordinate's violation of another's constitutional rights if he acted knowingly or with deliberate, reckless indifference. *Tennison,* 570 F.3d at 1088–89. However, "willful blindness" requires "deliberate actions to avoid" confronting the facts presented. *United States v. Heredia,* 483 F.3d 913, 918 n. 4 (9th Cir. 2007). "Supervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable, because negligence is no longer culpable under section 1983." *Jones v. City of Chicago,* 856 F.2d 985, 992–93 (7th Cir. 1988) (upholding jury verdict against a supervisory police officer because "there was . . . enough evidence to enable the jury to infer that" he had concealed an exculpatory report). *See also Harper v. City of Los Angeles,* 533 F.3d 1010 (9th Cir. 2008). To be liable, therefore, the supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Jones,* 856 F.2d at 992–93.

Even assuming that Sergeant McLaws did not know about the similar robberies occurring in other municipalities, three out of the six robberies at issue here occurred within the Town of Gilbert. He participated to some extent in the investigation of all of those robberies, and all were investigated by Detectives who were under his supervision.

He responded to the scene at robbery one, at which time he directed the "on-scene police officers in securing the scene and processing the scene for evidence." (Doc. 97-2, Ex. B ¶ 9). There is also evidence that may indicate that Sergeant McLaws actually responded to both robberies four and six. Although he does not specifically recall whether he did so, he nevertheless agrees he was generally aware of the incidents and gave direction to the Gilbert police personnel on scene about processing evidence. He was also aware of the suspect's description in all three crimes.

In addition to being Detective Brock's supervisor and reading and approving all of her reports, including the reports concerning robbery one, he was also the supervisor of Detective Estavillo, who investigated robbery four, and Detective Palmer, who investigated robbery six. The Investigations-Persons Crimes Unit, which he supervised, was charged with investigating bank robberies that occurred within Gilbert. There is admissible evidence from which a jury could conclude that robbery one and robbery four were the only bank robberies that occurred within Gilbert in 2000. As has been previously discussed, the unit was small and, according to Sergeant McLaws lent itself to the efficient exchange of information. Further he testified that to the extent he was aware of information from one investigation that was relevant to another officer's investigation, he would share that information. Crime bulletins were posted in the Unit.

After robbery six, Sergeant McLaws discussed with Detective Jim Palmer the similarities of the witnesses description of the suspects in both robbery four and robbery six. There is no evidence that Sergeant McClaws raised with Detective Palmer, or anyone else, the similarities between those two robberies and robbery one. There were, however, if anything, more similarities between robberies four and six and robbery one than there were between robbery six and robbery four. Robberies one and six were of the very same bank, and in both robberies the perpetrator was described as pointing a gun at the teller, which was not the case for robbery four which occurred just across the intersection. Robberies one and four occurred only two months apart, while there was more than a year between robbery four and robbery six. A reasonable juror could conclude that when Sergeant McLaws raised with Detective Palmer the similarities between robbery six and robbery four, Sergeant McLaws realized those same similarities also applied to robbery one. A reasonable juror could also conclude that Sergeant McLaws did not raise those similarities with Detective Palmer because he was aware that an arrest and conviction had already occurred for robbery one.

Even assuming Detective McLaws did not realize that the subsequent robberies formed a pattern of exculpatory conduct that would exculpate Jernigan from having committed the first until after the last was committed, he would still be required to disclose the subsequent

robberies at the time he came to this realization. As has been previously discussed, Jernigan's intervening conviction does not remove from law enforcement the responsibility to disclose exculpatory evidence of which it becomes aware. *Tennison,* 570 F.3d at 1094; *Broam,* 320 F.3d at 1030.

Thus, although a jury might draw other conclusions, there is evidence from which a reasonable jury could conclude that Sergeant McLaws was aware of exculpatory facts concerning Ms. Jernigan that he failed to disclose and that he was deliberately indifferent to her rights in not doing so.

### D.    Officer David Landgraf

With respect to David Landgraf, there is no factual basis set forth by Plaintiff's sufficient for a reasonable jury to find that he acted "with deliberate indifference to or reckless disregard for" her rights. *See*, *e.g.*, *Tennison,* 570 F.3d at 1088. There is no evidence that he ever had responsibility for investigating, or supervising the investigation of, any of the robberies at issue here. Nor is there evidence that he was in a position to become aware that there existed exculpatory facts with respect to Ms. Jernigan that were not disclosed. He assisted in the initial investigation of robbery number one to the extent that he assisted in removing still photographs from the bank's surveillance tape, and assisted SA Richard and Detective Brock in operating the software necessary to create the six-pack photo array. Approximately fifteen months later he apparently provided perimeter security at the scene of robbery number six. Plaintiffs offer no evidence that he was ever involved with robbery number four, that he ever had any investigative role with respect to robberies one, four or six, or that, during the relevant period he was in a position to realize that there were similarities in the three robberies that should have been disclosed. There is, therefore, no factual basis from which a reasonable jury could find that David Landgraf deprived Ms. Jernigan of a constitutional right by acting "with deliberate indifference to or reckless disregard for" her rights. *See, e.g., Tennison,* 570 F.3d at 1088. Any § 1983 claim against him is, therefore, dismissed.

With the exception of Officer Landgraf, however, there is evidence from which a

1  reasonable jury could find that the remaining Defendants acted with at least deliberate

2  indifference for Plaintiff's rights.

3  **III.    Qualified Immunity**

4      A law enforcement officer is entitled to qualified immunity unless: (1) he or she

5  deprived the Plaintiff of a significant constitutional right; and (2) that constitutional right was

6  "clearly established" at the time of the incident. *Pearson v. Callahan,* 555 U.S. 223, 239–41

7  (2009).[15] The Defendants here assert that neither of these requirements are met.[16]

8      In making a qualified immunity determination, the Court does not consider the

9  subjective knowledge or intent of the individual defendant, but applies an objective standard.

10  *See Anderson v. Creighton,* 483 U.S. 635, 641 (1987); *Grant,* 315 F.3d at 1090 (holding that

11  if, when "viewed in the light most favorable to the non-moving party, there [is] enough

12  evidence for a reasonable jury to conclude that reasonable officers would not have acted as

13  did [the Defendants]" then the officer is not entitled to qualified immunity). Of course,

14  sometimes even an objective evaluation requires the resolution of a factual dispute. When that

15  is the case, the factual question must be resolved by the jury. *Ortega v. O'Connor,* 146 F.3d

16  1149, 1154 (9th Cir. 1998). *See also Liston v. County of Riverside,* 120 F.3d 965, 975 (9th Cir.

17  1997) (quoting *Act UP!/Portland v. Bagley,* 988 F.2d 868, 871–72 (9th Cir. 1993).

18      **A.    Whether Defendants Deprived Plaintiff of a Constitutional Right**

19  _____

20      [15] Defendant Richard asserts that there is a third prong immunizing a Defendant from

21  liability if the Court determines that the officer's actions were "objectively reasonable."
   *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Sinaloa Lake Owners Ass'n v. City of Simi*

22  *Valley,* 70 F.3d 1095, 1099 (9th Cir. 1995). Generally, Courts refer to the qualified immunity
   exception as being the two prongs identified above. *See, e.g., Saucier v. Katz,* 533 U.S 194

23  (2001); *Grant v. City of Long Beach,* 315 F.3d 1081, 1089 (9th Cir. 2002). Even assuming

24  the Defendants have correctly identified a third prong, it does not change the result in this
   case for the reasons set forth in detail in this order.

25      [16] The same qualified immunity defense applies to both § 1983 actions and *Bivens*

26  actions. *Van Strum v. Lawn,* 940 F.2d 406, 409 (9th Cir. 1991) (holding that "[a]ctions under

27  Section 1983 and those under *Bivens,* are identical save for the replacement of a state actor
   under Section 1983 by a federal actor under *Bivens*"). S*ee also Graham v. Connor,* 490 U.S.

28  386, 394 n. 9 (1989) (same).

While acknowledging that it has already been conclusively determined that Ms. Jernigan was deprived of her constitutional rights by their collective action or inaction, Defendants assert that when their actions are objectively judged on an individual basis, as they must be for purposes of determining qualified immunity, they did nothing to deprive the Plaintiff of her constitutional rights.

In this case there are no factual disputes pertaining to what SA Richard knew or the facts that were provided to him with respect to all six of the robberies at issue here. There is no need to restate the facts pertaining to SA Richards' role in the investigations of all six similar robberies. Based on an objective standard, his acts were sufficient in themselves to violate Ms. Jernigan's constitutional rights.

With respect to Detective Brock and Sergeant McLaws, however, even an objective determination ultimately depends upon what Defendants actually knew when they failed to act. In this case an allegation that Defendants should have known certain facts that they did not know is insufficient to state a § 1983 claim. Because, however, there are facts upon which a reasonable jury could conclude that Brock and McLaws did have sufficient knowledge to have deprived Plaintiff of her constitutional rights, the questions of fact bearing upon whether Detective Brock and Sergeant McLaws are entitled to qualified immunity must be decided by a jury.

## B.   Whether Ms. Jernigan's Right Was Clearly Established

In determining whether a right is clearly established, the Court must not focus on "broad general proposition[s]" but on "the specific context of the case." *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Thus the relevant inquiry is whether "a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne,* 526 U.S. 603, 617 (1999). As the Court further explained in *Wilson*,

> In *Anderson,* we explained that what "clearly established" means in this context depends largely "upon the level of generality at which the relevant 'legal rule' is to be identified." . . . "[C]learly established" for purposes of qualified immunity means that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been

- 25 -

held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."

*Id.* at 614-15 (1999) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). *See also Tennison,* 570 F.3d at 1093–94 (holding that "[f]or a legal principle to be clearly established it is not necessary that the very action in question has previously been held unlawful, . . . [r]ather '[t]he dispositive inquiry is 'whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted") (quoting *CarePartners, LLC v. Lashway,* 545 F.3d 867, 883 (9th Cir. 2008)).

Defendants acknowledge that *Brady* clearly established that the prosecutor must disclose to the defendant material exculpatory evidence of which he or she is aware prior to trial. That principle was established in 1963. This principle has been applicable to police officers and agents since 1995 at the very latest. *Kyles,* 514 U.S. at 437–38 ("We have held that exculpatory evidence cannot be kept out of the hands of the defense just because the prosecutor does not have it, where an investigating agency does. That would undermine *Brady* by allowing the investigating agency to prevent production by keeping a report out of the prosecutor's hands until the agency decided the prosecutor ought to have it, and by allowing the prosecutor to tell the investigators not to give him certain materials unless he asked for them."). *See also Tennison,* 570 F.3d at 1087 ("[E]xculpatory evidence cannot be kept out of the hands of the defense just because the prosecutor does not have it, where an investigating agency does."); *United States v. Blanco,* 392 F.3d 382, 388 (9th Cir. 2004) (noting that "a prosecutor's duty under *Brady* necessarily requires the cooperation of other government agents who might possess *Brady* material"); *United States v. Zuno-Arce,* 44 F.3d 1420, 1427 (9th Cir. 1995) (holding that "it is the government's, not just the prosecutor's, conduct which may give rise to a *Brady* violation").

Similarly, it has long been established in this Circuit that exculpatory evidence includes evidence that tends to prove that someone other than the defendant committed a crime by showing that "other crimes similar in detail have been committed at or about the same time by a person other than the defendant." *United States v. Perkins,* 937 F.2d 1397,

1400 (9th Cir. 1991). *See also United States v. Crosby,* 75 F.3d 1343, 1347 (9th Cir. 1996) ("[f]undamental standards of relevancy . . . require the admission of testimony which tends to prove that a person other than the defendant committed the crime that is charged.") (quoting *United States v. Armstrong*, 621 F.2d 951, 953 (9th Cir. 1980); *United States v. Brannon,* 616 F.2d 413, 418 (9th Cir. 1980), *cert. denied,* 447 U.S. 908 (1980) ("A defendant is entitled to prove his innocence by showing that someone else committed the crime."). Before disclosure is required in such cases, however, identifying factors tying the other crime or crimes with the crime for which the defendant is charged must be "sufficiently distinctive to warrant an inference that the person who committed the act also committed the offense at issue." *United States v. Luna,* 21 F.3d 874, 879 (9th Cir. 1994) (quoting *Perkins,* 937 F.2d at 1400). *See also United States v. Andrini,* 685 F.2d 1094, 1097 (9th Cir. 1982).

*Smith v. Almada,* 640 F.3d 931 (9th Cir. 2011), cited by Defendants, does not set forth a contrary rule; it merely illustrates the principle. In *Smith,* Plaintiff had been arrested for setting fire to a consignment furniture store. The fire had been started by five gallon water bottles stuffed with papers and gasoline. Some of the papers were envelopes with Smith's name and address on them. When Smith was acquitted of the criminal charges, he brought § 1983 claims against the local police for, among other things, their failure to disclose a series of dumpster fires set at an address neighboring the furniture store that had occurred before Smith's dispute with the store. One of those previous dumpster fires was possibly set by a similar mechanism—"possible chemical based incendiary device in a plastic container." *Id.* at 934. In determining that the disclosure of the previous adjacent dumpster fires were not "sufficiently distinctive to warrant an inference that the person who committed [the other crime or crimes] also committed the offense at issue," *Andrini*, 685 F.2d at 1097, and thus did not have to be disclosed by the police to Smith, the district court noted that "[w]itnesses to the dumpster fires described various suspects with very different appearances, suggesting there was no repeat offender who might have later started the February 2003 fire." *Smith*, 640 F.3d at 939. Because the witness descriptions of the various perpetrators of the dumpster fires were all different from each other, no additional facts were "sufficiently distinctive" to

suggest the existence of a repeat offender setting dumpster fires in the adjacent neighborhood. Thus, the Ninth Circuit upheld the ruling of the district court that the police were not obliged to disclose the prior dumpster fires.

To the same effect is *United States v. Perkins*, which has some instructive similarities and distinctions from the facts in this case. 937 F.2d 1397 (9th Cir. 1991). Perkins had been originally charged with four bank robberies, but three of the charges had been dismissed before Perkins' trial. Each of the four robberies had been committed by a perpetrator or perpetrators who wore various disguises, approached the teller with something in which to carry the money, handed the teller a note, requested the money, and told the teller not to push any buttons. *Id*. at 1400. Perkins claimed that he was at work during two of the four robberies (although not the one for which he was tried). *Id*. Perkins made no attempt to show physical similarities in descriptions offered by witnesses to the perpetrator or perpetrators of all four of the robberies, or even a similarly recurring disguise. Rather he sought to show that in two of the four robberies the perpetrator used a tennis racket cover to carry away the robbery proceeds. *Id*.

In not allowing such evidence into trial, however, the court noted that the perpetrator of the crime for which Perkins was charged had not used a tennis racket cover to carry away the robbery proceeds. *Perkins*, 937 F.2d at 1400–01. Nor was there anything else sufficiently distinct about the description of the perpetrator or the modus operandi of the other three dismissed robberies that would serve to identify the perpetrator of the other robberies with the one for which Perkins was charged. *Id*.

Such facts are quite distinct from those presented here. Unlike in *Smith* or *Perkins,* the physical description of the suspect here (short, Hispanic female) was strikingly similar from crime to crime to crime. Further, in specific particulars the description recurred for both some of the robberies with which Ms. Jernigan was charged, and for some of the robberies that she could not have committed (pretty, with acne, with a "stretched appearance"). The witnesses' descriptions of her clothing, and her getaway vehicle were also virtually identical. Further, to at least some extent, her modus operandi had some similarities between the

- 28 -

crimes. The first five robberies occurred in a compressed period of time. Thus, unlike *Smith* or *Perkins*, there both was both direct[17] and circumstantial evidence that was sufficiently distinct to link the crime with which Jernigan was charged to crimes that she could not have committed. Thus neither *Smith* nor *Perkins* suggests that the exculpatory nature of the information in this context was not clearly established.

Defendants further assert that *United States v. Jernigan,* 492 F.3d 1050 (9th Cir. 2007) (*Jernigan II*) creates new law. Defendants argue that for the first time *Jernigan II* requires law enforcement to turn over exculpatory information concerning subsequent similar crimes even when those separate crimes were committed by suspects who did not look like the suspect of the crime at issue. Such a characterization, however, distorts *Jernigan II*'s holding beyond recognition.

In virtually all cases involving a series of crimes that contain distinct similarities, law enforcement cannot know, and they did not know here, whether separate suspects are involved. In such circumstances where the similarities are "sufficiently distinctive to warrant an inference that the person who committed [the other crime or crimes] also committed the offense at issue," it has long been clearly established that the evidence is exculpatory and, thus, law enforcement is obliged to disclose it to the defendant. *Perkins,* 937 F.2d at 1400. *Jernigan II* did nothing to add to or take from that rule.

Upon Ms. Rodriguez-Gallegos's arrest, nine months after Jernigan's conviction, it could be discerned that she and Jernigan are not the same person even though they share

---

[17] Based upon her review of the surveillance photo of the suspect in the first robbery, Kerry Ward, the victim of the second robbery, thought she was robbed by the same person. Though given the chance to do so, Ward did not identify Ms. Jernigan as the perpetrator of her robbery. Further, the getaway vehicle used during the second robbery, was the same make, model, color and trim as the getaway vehicle described by a witness to the fifth robbery. Ms. Jernigan could not have committed the fifth robbery, although the description of the fifth robber was generally the same as the descriptions given of the perpetrator of robberies one through four.

some general physical similarities.[18] But, that fact, without more, exculpates Ms. Jernigan at least as much as it inculpates her. And, even if it did, somehow, inculpate Ms. Jernigan, it could not have been discerned until nine months after Ms. Jernigan's conviction. Prior to that time all that law enforcement knew is that they had a series of similar crimes committed by a similarly described perpetrator. Thus, it could not provide a basis upon which SA Richard could claim that Jernigan's right to the exculpatory information he knew before her trial was not clearly established.

If an objective person could discern from the surveillance tape of the first robbery that Ms. Jernigan committed it, or at least, that the perpetrator portrayed in the surveillance tape from robbery one is clearly not the perpetrator displayed in the surveillance tape from robbery four, that might have justified SA Richard's failure to disclose robbery four to Jernigan. The poor quality surveillance photos from robbery one, however, preclude an objectively reasonable law enforcement officer from making such a determination.[19]

At oral argument counsel for SA Richard conceded that there is nothing in the record that specifically states that SA Richard compared the surveillance photos from robberies one and four and concluded that the perpetrators could not be the same person. Counsel also expressed doubt that there was actually a time when law enforcement agents assembled and considered evidence such as photographs in determining whether distinctions could be drawn between the perpetrator(s) of the six crimes. He characterized the asserted consensus to

---

[18] It is not clear that Ms. Jernigan shares all the specific physical characteristics that witnesses to the crimes identified. For example, SA Richard himself at oral argument, in suggesting that Ms. Jernigan could not be described as attractive asserted that he and other law enforcement referred to her as a "troll," thus, not somebody who could be described as "kind of pretty." Further, Ms. Jernigan had tattoos over her hands and arms, whereas the perpetrator was described as having no such tattoos.

[19] The Court is, of course, aware that the original trial judge in this matter stated in denying Ms. Jernigan's motion for new trial that he did not think that the two perpetrators resembled each other. But, as will be discussed in more detail, he made that determination only after having also heard false testimony from SA Richard concerning the distinctions between the two perpetrators. Further, he made no definitive statement that the two perpetrators were not the same.

which SA Richard testified as a "negative" consensus or a consensus apparently resulting from the fact that no one else aware of, or investigating the crimes, ever said anything to SA Richard that suggested to him that he should proceed differently in his investigation. Nevertheless, at the hearing on the motion for new trial, SA Richard testified that "at no time after we reviewed the facts in the case, as in the photographs and the descriptions, did we ever conclude anything but those sets of robberies, the first three and those two, were committed by two different robbers." (Doc. 130-2, Ex. 20 at 200-03).

To the extent that this could be viewed as testimony by SA Richard that he compared the surveillance still photos of the two robberies, the Court has reviewed those same stills. The surveillance video of robbery one provides poor quality photographs of the perpetrator, while the surveillance video of robbery four provides photographs of the perpetrator of that robbery of slightly better quality, though still somewhat obscured. This Court believes that there is some notable resemblance between the two perpetrators. Given the poor quality of the first surveillance photo and the mediocre quality of the second, however, this Court cannot determine whether the perpetrators depicted in the two photos are the same person. By the same token, however, a comparison of the photographs does not provide a reasonable law enforcement officer with sufficient justification to conclude that the photos from robbery one portray either Ms. Jernigan or a person other than the perpetrator of robbery four. Even assuming the surveillance photo of robbery one was clear enough to eliminate Rodriguez-Gallegos as a suspect for that crime, unless the surveillance photo was clear enough to determine that the perpetrator was actually Ms. Jernigan there would be no justification for not disclosing to Ms Jernigan robberies four and five, which were strikingly similar to robbery one, especially since Ms. Rodriguez-Gallegos was unknown to law enforcement at the time.

Ms. Chlupsa's identification of Ms. Jernigan as the perpetrator from a six-pack photo array was not in and of itself a sufficient basis to withhold the exculpatory evidence. If it were, then protection from wrongful conviction based on erroneous eyewitness testimony that a fair trial provides would be meaningless. As Judge Fletcher noted in her dissent from

the original panel majority, "[c]enturies of experience in the administration of criminal justice have shown that convictions based solely on testimony that identifies a defendant previously unknown to the witness is highly suspect. Of all the various kinds of evidence it is the least reliable, especially where unsupported by corroborating evidence." *Jernigan I,* 451 F.3d at 1034 (Fletcher J., dissenting) (quoting *Jackson v. Fogg*, 589 F.2d 108, 112 (2d Cir. 1978)).

SA Richard asserts, however, that despite the sufficiently distinct evidence which links the robberies for which Ms. Jernigan was convicted with those she could not have committed, he was not obliged to disclose robberies four and five. He was so excused, he claims, because after comparing and considering all the witness statements from the first five robberies, both with others at the FBI and with the police departments for the municipalities in which the robberies were committed, law enforcement personnel formed a consensus that robberies one through three were committed by one perpetrator, and robberies four and five were committed by another.

There are at least three problems with this argument. First, despite SA Richard's testimony at the hearing on the motion for new trial that other law enforcement personnel could testify as to the consensus arrived at by the different law enforcement agencies,[20] he

_____

[20] Q. BY MR. MORRISSEY: Would other agents have been present that could come and testify that these meetings took place?

A. Certainly there would have been other agents, because one set of meetings that we had on a weekly basis involved the bank robbery FBI agents, and at this point it was a task force. We also had a detective who was deputized by the marshals who was assigned to it. We met on a weekly basis.

Additionally there is a weekly robbery meeting that is located at the Phoenix Police Department that we would attend. Although Phoenix is the host, routinely Scottsdale, Mesa, Tempe all of the local police departments send representatives. We discuss bank robberies that have occurred, we discuss trends, we discuss whether we attribute one robber to different robberies in different jurisdictions. That was also occurring around this time period.

Doc. 97-3, Ex. G at S-B-O-003790.

has offered no admissible evidence to establish such consensus in conjunction with these motions. To the extent that his declarations seek to summarize the out-of-court statements of others that there was such a consensus, these statements are hearsay and are not admissible. *Harkins Amusement Enter., Inc., v. General Cinema Corp.,* 850 F.2d 477, 490 (9th Cir. 1980), *cert. denied,* 488 U.S. 1019 (1989); *Blair Foods, Inc., v. Ranchers Cotton Oil,* 610 F.2d 665, 667 (9th Cir. 1980).

Second, in his testimony at the hearing on the motion for new trial, SA Richard testified that, given the similarity in the descriptions offered of the five robberies, he, and apparently other law enforcement officers, would have given "thoughtful consideration" to whether a single person, who could not have been Ms. Jernigan, could have committed all of them.[21] Even if the Court were to accept, however, that when SA Richard became aware

---

[21] Q. And you did not in any way consider the possibility that the person who robbed the bank on September 20th, 2000 could have been the same person who robbed the bank on November 28th, 2000 across the street; right?

A. No, sir. I don't know that that's entirely accurate. We should—we would have given that consideration.

Doc. 97-3, Ex. G at S-B-O 003779.

Later on redirect examination SA Richard further explained:

THE COURT: So you're saying again, from a credibility standpoint at least, Mr. Richard, that a bank robbery right across the street in a 30 day period robbed by what is variously described as a Hispanic woman, five feet plus or minus, 125 pounds, Hispanic looking, long hair, with or without a gun, you wouldn't consider, gee, that might be the same person?

THE WITNESS: Yes, sir. I don't want to minimize what we would have done. Certainly we would have given that thoughtful consideration. But after we reviewed the facts of the case or the facts of the cases and descriptions, we would have made a thoughtful deliberation in conjunction with the police departments associated with those investigations. And at no time after we reviewed the facts in the case, as in the photographs and the descriptions, did we ever conclude anything but those sets of robberies, the first three and those two, were committed by two different robbers.

of the similarity in the descriptions he reviewed the exculpatory facts with other law enforcement personnel and determined that legitimate distinctions could be made, nothing about that review, or their hypothetical resulting consensus, justifies withholding the exculpatory facts from the prosecutor or Ms. Jernigan. Once there are sufficiently distinctive facts that link crimes that the defendant is accused of committing with crimes she could not have committed, law enforcement cannot decide that those facts may be disregarded based on other considerations. It is clearly established that it is the jury's right to make such determinations.

In 1995, the Supreme Court emphatically rejected the notion that law enforcement had the right to withhold exculpatory information from a prosecutor based on law enforcement's separate determination that the seemingly exculpatory information could be explained away:

> [Louisiana] pleads that . . . it should not be held accountable under *Bagley* and *Brady* for evidence known only to police investigators and not to the prosecutor. . . . In the State's favor it may be said that no one doubts that police investigators sometimes fail to inform a prosecutor of all they know. But . . . any argument for excusing a prosecutor from disclosing what he does not happen to know about *boils down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials.*"

*Kyles,* 514 U.S. at 437–38 (emphasis added). *See also Tennison,* 570 F.3d at 1094 ("'If there

---

THE COURT: I'm talking about the one robbery that's at issue in this case.

THE WITNESS: Yes, sir. We would have considered that.

THE COURT: Well, did you?

THE WITNESS: Yes, sir, we did.

*Id.* at S-B-O 003788–89.

This testimony at the hearing seems directly in conflict with the two declarations he has filed in this matter in which he states "Because I believed that I was investigating two separate individuals, it never occurred to me that information from the Rodriquez-Gallegos investigation could be relevant to the Jernigan investigation." (Doc. 145-2, Ex. A, ¶ 12; Doc 162-2, Ex. 1, ¶ 12).

were questions about the reliability of the exculpatory information, it was the prerogative of the defendant and his counsel—and not of the prosecution—to exercise judgment in determining whether the defendant should make use of it.") (quoting *Disimone v. Phillips*, 461 F.3d 181, 195 (2d Cir. 2006)); *United States v. Wood,* 57 F.3d 733, 737 (9th Cir. 1995) ("The government in the form of the prosecutor cannot tell the court there is nothing more to disclose while the agency interested in the prosecution holds in its files information favorable to the defendant."). In light of that precedent, SA Richard could not do what he now claims justifies his non-disclosure.

Third, and most troubling, SA Richard testified to a number of facts at the hearing on Jernigan's motion for new trial that he either now admits were not true, or cannot support with admissible evidence. Further, rather than merely being unsupported, based on the admissible evidence in the record, the distinctions to which he testified are affirmatively contradicted by the record.[22] At best they resulted in distinctions and conclusions that, based on the records on which they were made, no reasonable law enforcement officer could make. He has repeated at least some of those apparently untrue statements under oath in the declarations he

---

[22] Because SA Richard relies on the accuracy of those distinctions to both support his motions for summary judgment and contest the Plaintiff's motion for summary judgment, he bears the burden of establishing their accuracy. "[I]f the nonmoving party will bear the burden of proof at trial as to an element essential to its case, and that party fails to make a showing sufficient to establish a genuine dispute of fact with respect to the existence of that element, then summary judgment is appropriate." *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). SA Richard has failed to do so here. The Court, nevertheless, entered an order requiring the parties to review and disclose to the court the witness descriptions that would have provided the basis for the comparisons summarized by SA Richard in several specified particulars. (*See* Doc. 185). The parties complied with the Court's order (*See* Docs. 186–88), and SA Richard affirmed at oral argument that he did not contest the accuracy of the copies of the police reports provided to the Court by the parties. The Court may consider these witness statements and the police reports in which they are contained because the use of police records are not excluded by the hearsay rule in civil cases. Fed. R. Ev. 803(b). Further, the statements contained in the police reports describing the perpetrator, her clothing or her actions are considered not for the truth of those descriptions, but to establish what the police records indicated the description was. The Court may thus consider them as admissible evidence in ruling on the parties' various motions.

has filed in this matter.

1.     **Misstated Facts That Implicate Ms. Jernigan as Opposed to Gallegos**

SA Richard testified at the hearing on the motion for new trial that in her escape from the first robbery "the robber left, went through a hole in the fence that separated the Bank of America shopping complex . . . [and] went through the fence into an apartment complex that we later determined Miss Jernigan had lived at." (Doc. 97-3, Ex. G at S-B-0 003732). There is no support for this testimony. This Court ordered Agent Richard to "[i]dentify with specificity any documents or witness interviews which disclosed . . . to SA Richard or other law enforcement investigators" that "after the first robbery, the perpetrator escaped through a hole in the fence that went to an apartment complex in which Jernigan used to live." He could not do so. Rather he cited to witness statements taken after the first robbery and a police report that describe the perpetrator as running east towards the strip mall on the corner. None of them describe the perpetrator as going through a hole in the fence that separated the Bank of America shopping complex from an apartment complex. He admitted as much at oral argument.

Obviously, testifying that the perpetrator escaped into an apartment complex in which Jernigan used to live implicates Jernigan. The statement that the perpetrator escaped into the complex, however, is without any foundation in fact.

Further, according to SA Richard's report, at the time of her arrest on November 10, 2000, Ms. Jernigan was transient with no employment and had a history of drug use. SA Richard testified at the hearing on the motion for new trial that the witnesses to the first three robberies described the perpetrator as "a transient looking individual" and someone who "was possibly [a] transient or drug addict." (Doc. 97-3, Ex. G at S-B-O 003732, 003762). But, as SA Richard admitted at oral argument, no witness statements from the first three robberies describe the perpetrator as being a transient or a drug addict. There are witness descriptions from these robberies that affirmatively reject the suggestion that the perpetrator was transient or appeared to be a drug user.

## 2. Attractiveness

In his testimony before Judge Carroll, SA Richard testified that witnesses described the perpetrator of the alleged first set of robberies as less attractive than the perpetrator of the putative second set. He testified: "I recall her being described as unattractive, a lot of heavy eye makeup, things of that nature." (*Id.* at S-B-O 003732). In his testimony he contrasted these descriptions with the descriptions of the perpetrator of the second set of robberies which he characterized as being "attractive, younger. I think one of the tellers told me that she looked like she just stepped out of a club in Scottsdale." (*Id.*; *see also id.* at S-B-O 003760) ("I don't recall what each witness described. My recollection is, the first three robberies that we attribute to Miss Jernigan, the description was an unattractive person, heavy eye makeup, possibly transient or drug addict. . . . And at least one of the tellers described [the purported second perpetrator] as attractive, and I believe one of the tellers said she looked like she had just stepped out of a club in Scottsdale.").

Despite SA Richard's attempted summarization of what the witnesses described, no statement of any witness described the putative "first" bank robber as unattractive. To the contrary, according to the FBI report prepared by SA Richard, in her initial interview with him, Ms. Chlupsa, the teller during the first robbery, described the perpetrator as having a "casual pretty appearance." (Doc. 97, Ex. A at TOG000123). She apparently stated that the robber "doesn't look like [she's] off [the] streets, kind of pretty, clean." (Doc. 130-3, Ex. 21-J at FBI388–89). Ms. Chlupsa did describe the perpetrator as having eyebrows that had been plucked and wearing a lot of eye liner, (Doc. 97-2, Ex. A at TOG000122, 131), as did Ms. Ward, the teller during the second robbery (Doc. 97-4 Ex. L at KR-380, 396; Doc. 130-3, Ex. 21-J at S-B-O 2383) ("a lot of eye liner"). Ms. Etherington also described the robber as having black well-kept eyebrows and brown eyes. (Doc. 97-4, Ex. L at KR-428).

This Court ordered SA Richard to "identify with specificity the documents/witness interviews on which" SA Richard could have based his testimony that "the person who committed the first three robberies was described by witnesses as unattractive." He was unable to do so. Rather, he cited to the booking photograph of Rachel Jernigan, two

surveillance photos taken from the September 20 videotape, the statement of the teller from robbery number two that "the robbery looked like she had just woken up," and a phone interview with her in which that same teller witness stated that the perpetrator "wore a lot of dark eye makeup, eyeliner and mascara which was 'gaudy.'"

Of course, on their face, none of the above documents support SA Richard's testimony that witnesses described the perpetrator of the first three robberies as unattractive. Nothing about the surveillance photos relates to any statement made by a witness.

Kerry Ward, the teller in robbery two, described the perpetrator as wearing a lot of eye makeup and mascara. So did Elizabeth Chlupsa, the teller in robbery one. Colette Etherington, the teller in robbery three, also mentioned the perpetrator's eyebrows as well-kept. Presumably, that all three tellers noticed and mentioned a similarity in eye makeup is one of the reasons why the FBI, and presumably SA Richard, concluded the perpetrator was the same. Yet, while neither Ms. Etherington, nor Ms. Ward commented on the attractiveness of the perpetrator, Ms. Chlupsa described the perpetrator of robbery one directly to SA Richard himself as "kind of pretty." To the extent that SA Richard suggests he was entitled to ignore Ms. Chlupsa's description of the perpetrator as "kind of pretty" because Ms. Ward described her eye makeup as "gaudy," only reveals the extent to which he is straining to try to make out an argument that he acted reasonably. It does nothing to explain his testimony before the trial judge that witnesses described the first perpetrator as an unattractive, transient drug addict.

Nor can Ms. Ward's statement that the perpetrator looked like she just woke up serve as a basis for concluding that the perpetrator of robberies one through three is unattractive and the perpetrator of robberies four through six is attractive. Ms. Ward (robbery two) and Mr. Denetdeel (robbery five) both described the perpetrator as looking like she just woke up. If such an appearance is a legitimate basis for SA Richard to conclude that the perpetrator is unattractive, it does not provide a basis on which he could distinguish the perpetrator of the first three robberies from the perpetrator of the last three, since the perpetrators from both sets of crimes were described that way. SA Richard admitted as much at oral argument.

In his two declarations filed under oath in this matter he states "based on witness

descriptions, there was a consensus that Ms. Jernigan was older and that Rodriguez-Gallegos was prettier; that the modus operandi of the two perpetrators was different; and therefore, among other things, we were dealing with two different people."(Doc. 145-2, Ex. A ¶ 12; Doc 162-2, Ex. 1 ¶ 12). This Court thus also ordered SA Richard to "[i]dentify with specificity the documents/witness interview on which SA Richard, or those forming the law enforcement consensus, could have determined that a perpetrator that was described as 'pretty' in the first robbery, was not as attractive as the perpetrator described as 'cute' or 'attractive' in robberies four or six." Again, rather than doing so, SA Richard again cited the September 20 surveillance photographs, the booking photos of Rachel Jernigan and Juanita Rodriguez-Gallegos, and statements that a perpetrator had a polite smile and well groomed fingernails. To the extent that the perpetrator of robberies four through six was described as having a nice smile and well groomed fingernails, so was the perpetrator of robbery one. (*See*, *e.g.*, Doc 97, Ex. A at TOGOOO135) (stating that the perpetrator smiled but did not talk); (Doc. 130-3, Ex. 21-J at FBI000388) (describing nails as "not long (not) painted, small hands").[23]

On their face, none of the above statements is sufficient to support SA Richard's assertions in his Declaration that "based on witness descriptions there was a consensus that the perpetrator of the second set of robberies was prettier than the first." In fact, Gabrielle Emmons, the teller during robbery four, described the perpetrator to SA Richard much as Ms. Chlupsa described the first—"very clean, not a street person or drug addict." (Doc. 97-4, Ex. L at KR-913). She looked "cute" and "didn't look homeless or like a junkie." (Doc. 130-3, Ex. 21-J at FBI00996). Allison Williams, the teller/victim of the fifth robbery, similarly described the perpetrator as "cute." Kathy Golliher, the teller during robbery six, described the perpetrator right after the robbery as "quite attractive." (Doc 97, Ex. L at KR-1064). Further, of course, SA Richard would not have had booking photographs of Rodriguez-Gallegos at the time he should have disclosed this evidence.

---

[23] Further, to the extent that the perpetrators hands were described by witnesses to the first three robberies as being without tattoos, (*see*, *e.g.*, *id.*, at 00452, 00473), Rachel Jernigan had tattoos on her hands.

Thus, despite his testimony to the contrary, both at the hearing on Jernigan's motion for new trial, and in his declarations filed in this matter, SA Richard provides no admissible evidence that any witness described the perpetrator of robbery one as unattractive, or that there is any basis in the witness statements from which he could have drawn a reasonable distinction that the perpetrator of robberies four through six was more attractive than the perpetrator of robberies one through three sufficient to conclude that there were different perpetrators and on that basis withhold disclosure of those later robberies from Ms. Jernigan.

### 3.  Age

In his declarations, SA Richard states that the perpetrator of the first three robberies was older than the perpetrator of the last three robberies.

There were five witnesses to the first robbery that provided an estimate as to the age of the robber. They varied. Elizabeth Ms. Chlupsa estimated the robber as between 35-40 (Doc. 97-2, Ex. A at TOG000122, 131), whereas Bernice Manlowe thought the robber was between 15 and 25 years old (*id.* at TOG000109). Hawley thought her between 23-27 years old (*id.* at TOG000135), Donovan Grierson thought she was between 28-30 (*id.* at TOG000134), and Kathleen Golliher identified her as being in her thirties (*id.* at TOG000109).

Witnesses to the second robbery identified the robber as being in her early 30's (Doc. 97-4, Ex. L at KR395) (Ward); (*id.* at KR400) (Mills), or in her late 20's or early 30's (Doc. 187, Ex. 9k at FBI000565) (Ophardt).

Etherington, the victim/teller of the third robbery, placed her perpetrator between the ages of 25-30 years. (Doc. 97-4, Ex. L at KR-428).

Gabrielle Emmons, the victim/teller of the fourth robbery, placed the age of the perpetrator between 19-25 (*id.* at KR-943), while Boyd Denetdeel estimated her age between 25-30 (*id.* at KR-932).

Allison Williams, the victim/teller of robbery number five, identified the perpetrator as being in her 30's, (*id.* at KR-990), while Kathy Golliher, the victim/teller of robbery number six, and Debbie McMullen both identified the perpetrator as being thirty years old (*id.*

1   at KR-1064, KR-1061).

2          Based on the variety of estimates provided in the witness statements, no reasonable

3   law enforcement officer could conclude that there is a reasonable basis for distinguishing,

4   based upon age, the perpetrator of the first three robberies, from the perpetrator of the last

5   three sufficient to justify withholding of the exculpatory evidence to Ms. Jernigan.[24]

6          **4.     Modus Operandi**

7          Although in his declarations filed in this matter, SA Richard did not explain what

8   differences he noted in the modus operandi of the suspect in the first three and the last three

9   robberies, he does testify that unspecified differences exist. In his May 2004 testimony during

10  the hearing on the motion for new trial, however, he spelled out what he alleged to be those

11

12

13

---

14          [24] In his supplemental pleading filed in response to the Court's inquiry concerning the
15   content of the witness statements, SA Richard now also asserts that the witness statements
     generally describe the robber of the first second and third robberies as weighing less than the
16   perpetrator of the fourth fifth and sixth robberies. This distinction is not born out by the
17   person who actually has been convicted for, and admitted to, perpetrating robberies four, five
     and six. When Rodriguez-Gallegos was arrested she was 4'11" and weighed 96 lbs. When
18   Jernigan was arrested in November 2010, she was 5'1" and 130 lbs. Even so, while a few of
     the witnesses to the last three robberies described the perpetrator as "stocky,"other witnesses
19   to the same robberies described her as small. Most witnesses to those same robberies
20   provided an estimate of the height and weight of the perpetrator which is in the same general
     range of the estimates given by witnesses to all six robberies. Further, this same weight
21   variance in description occurred among the various witness descriptions of the first robbery
     as well. *See, e.g.,* Manlowe describing the first perpetrator as "short and stocky," (Doc. 97,
22   Ex. A at TOG000109), while Hawley described her as being slender and athletic, (*id.* at
23   TOG000135), and Ms. Chlupsa described her as being "very small." (*Id.* at TOG000131).
     Nandasana estimated her to be 4'8" and 130 lbs (*id.* at TOG000109), while Golliher estimated
24   her to be 5'0" and 110 lbs—four inches taller and 20 lbs lighter. (*Id.*). Further, to the extent
25   SA Richard desires to assert that, based on the witness descriptions, he would have been able
     to determine that there were two separate robbers because the perpetrator of the first three
26   robberies weighed less than perpetrator of the last three, there is both no testimony that he
27   drew such a conclusion, that such a conclusion would have been valid, and that based on the
     actual witness statements, any reasonable law enforcement officer would have been able to
28   draw such a conclusion.

differences. They also do not bear up under scrutiny.[25]

Q. Did you consider Gallegos and Ms. Jernigan to have a similar modus operandi?

A. No.

Q. Why not?

A. The—during this time period of 2000, if I could talk about those five robberies, since they were within several months of each other, three robberies occurred which we attributed to one robber. That robber we eventually identified as Miss Jernigan. During those robberies basically a woman would go in, stand in the teller line, generally not speak, present a note, have a gun in a bag, lift the bag up, display the weapon, and leave the bank.

During the first robbery, which was the Bank of America at 15 East Guadalupe, the robber left, went through a hole in the fence that separated the Bank of America shopping complex, I believe there was a grocery store and bar and some other things in that strip mall, went through the fence into an apartment complex, that we later determined Miss Jernigan had lived at.

That individual was basically described as a transient looking individual. I recall her being described as unattractive, a lot of heavy eye makeup, things of that nature.

The two robberies that occurred after the three we attribute to Miss Jernigan were committed by a woman who did speak to the tellers. In fact would say, I'm sorry I'm doing this, things of that nature, please don't hit your alarm. She was described as attractive, younger. I think one of the tellers told me that she looked like she just stepped out of a club in Scottsdale.

We attributed because of the differences, those two set of robberies to being to two different people.

In addition that second set of robberies that was later admitted to by Miss Gallegos there was no weapon involved.

Q. Until the final December 11th , 2001 robbery; is that correct?

---

[25] There were certain similarities between the modus operandi of the perpetrator of all the first five robberies. The robber would wait her turn in line, present the teller with a note, usually sloppily written on folded or crumpled white paper, and then retrieve the note and take it with her along with the proceeds of the bank robbery. It may be that none of these similarities in modus operandi alone would be sufficiently distinct to connect the robberies and require disclosure. But, just as the similarities in modus operandi on their own would be insufficient to require disclosure, even if the distinctions that SA Richard offers in the modus operandi were correct, which they are not, given the other similarities in witness descriptions, the distinctions in modus operandi alone would be insufficient to support a conclusion by a reasonable law enforcement officer that two separate perpetrators committed the crimes and thus he could withhold disclosure of robberies four and five.

A. Right. Miss Gallegos committed two robberies within two days of each other in the year 2000. Then we didn't hear from her again for over another year when she hit the third time, robbing that Bank of America at 15 East Guadalupe. She did present a weapon, and she was stopped immediately thereafter, had the gun, had the money.

Q. Okay. But as of March 2001, the Ms. Jernigan trial, had Rodriguez Gallegos ever used a weapon by that point?

A. Never used, and I don't believe ever threatened in the note. No mention of a weapon.

(Doc. 97-3, Ex. G at S-B-0 003731–33; *see also id.* at S-B-O 003762) ("The second two robberies, which were unarmed robberies where that robber did speak as opposed to Miss Jernigan, who was very polite.").

### a.      Presence of the Gun and the Bag

SA Richard testified to a distinction between the perpetrator of the first three robberies and the perpetrator of the next two because the perpetrator of the first three robberies pulled a gun from a bag, while the perpetrator of the next set of robberies did not. While the use of a gun and a bag or purse generally fits the description given by the victim tellers in the police reports of robberies one, two and six, no victim in robbery three, four or five described seeing a purse, bag or weapon. SA Richard admitted at oral argument on these pending motions that he was incorrect in suggesting that the perpetrator of robbery three had a bag or displayed a weapon. Thus, to the extent SA Richard testified that the presence of a gun and a bag created a meaningful distinction in the witness descriptions of the first three robberies that distinguished the perpetrator from the next two, that distinction is unsupported by the witness statements submitted.

### b.      Use of a Note and Speaking To Tellers

SA Richard also testified that the perpetrator of the first three robberies would generally not speak but would use a note, while the perpetrator of the fourth and fifth robberies spoke to the teller victims. This Court ordered SA Richard to "[i]dentify any documents or witness interview with specificity from which Richard or the law enforcement officers could have concluded that the perpetrator of the third robbery (October 25, 2000) did

not speak to her victim/teller." Richard acknowledged that "there do not seem to be any documents within the possession of Agent Richard which support this statement." (Doc. 187 at ¶ 3a).

Further, the witness statements and police reports demonstrate that the perpetrator(s) of all five robberies gave the teller a note which the robber then took back from the teller. Thus, although SA Richard testified to a distinction between the perpetrator of the first three robberies and the perpetrator of the next two because the perpetrator of the first three robberies did not speak to her victims, but used notes, while the perpetrator of the next set of robberies spoke to her victims, that distinction is unsupported by the facts.

### c.    Threats

SA Richard not only testified that in the "second set of robberies that was later admitted to by Miss Gallegos, there was no weapon involved," (*Id.* at S-B-O 3732–33), he further testified that not only did the second robber not use a weapon, but she never threatened to use a weapon in her note. Again, this testimony is not supported by the facts.

As has been discussed, the perpetrator in robberies one, two and six all pointed guns at the teller/victims. The statements of the victim/tellers in robberies three and five demonstrate that the notes they were given by the perpetrator threatened them with death if they did not cooperate. Only victim teller four did not report being threatened with deadly force should she fail to cooperate.[26] To the extent that SA Richard testified to a distinction between the perpetrator of the first three robberies and the perpetrator of the next set because the perpetrator of the first three robberies threatened her victims while the perpetrator of the next set of robberies did not, he misstates the facts.

SA Richard testified that distinctions in the described suspects and robberies demonstrated that there were two distinct perpetrators, one for robberies one through three, and another for robberies three through five. On the record in this case, however, no

---

[26] When she ultimately confessed to additional bank robberies, Rodriguez-Gallegos acknowledged that she had a weapon with her during each of the robberies, although she claimed it was not loaded. (Doc. 97-4, Ex. L at KR-156).

reasonable law enforcement officer could have arrived at such a conclusion.

## III.    Judicial Disagreement

The Defendants also argue that any disagreement among judges about whether, under the circumstances, *Brady* required them to disclose the exculpatory material, demonstrates that the right to the information could not have been so "clearly established" in the circumstances as to expose them to liability for failing to disclose it.

Specifically, Defendants acknowledge that in *Jernigan II,* the Ninth Circuit ruled, by a 13-2 *en banc* majority, that there was a *Brady* violation when the subsequent similar robberies were not disclosed to Ms. Jernigan. *United States v. Jernigan,* 492 F.3d 1050 (9th Cir. 2007). Nevertheless, the trial judge who heard the motion for new trial, the original Ninth Circuit panel majority of two judges, *see, Jernigan I,* 451 F.3d 1027 (9th Cir. 2006), and the additional judge who joined one of the panel majority in dissenting to the *en banc* majority, were all of the view that the subsequent robberies were not material to Ms. Jernigan's conviction. Therefore, the Defendants argue, because even judges disagree about whether there was a *Brady* violation in this case, the right in this factual setting is not clearly established and they are entitled to qualified immunity.

It is true that both *Pearson v. Callahan,* 555 U.S. 223 (2009) and *Wilson v. Layne,* 526 U.S. 603, 615, 618 (1999), establish that liability may not be imposed upon law enforcement officers for failing to afford a person his constitutional rights when judges themselves cannot agree, as a matter of law, whether the right exists. At bottom, however, Defendants' argument that they are entitled to qualified immunity is based on the acceptance by the dissenting judges of SA Richard's untrue testimony at the May 2004 hearing on Ms. Jernigan's motion for a new trial. Law enforcement officers are not entitled to qualified immunity when they testify to statements that they "knew to be false or would have known were false had [they] not recklessly disregarded the truth." *Branch v. Tunnell,* 937 F.2d 1382, 1387 (9th Cir. 1991), *overruled on other grounds by Galbraith v. County of Santa Clara,* 307 F.3d 1119 (9th Cir. 2002). SA Richard cannot render false testimony and then claim that the dissenting judge's reliance on his false testimony provides him and the other Defendants with qualified

immunity. Such a counterintuitive result is required by neither *Pearson* nor *Wilson*.

In making the materiality determination, as the trial judge initially did here, a judge inevitably weighs the strength of the underlying evidence offered at the original trial against the strength of the exculpatory evidence and the additional evidence to which the exculpatory evidence might have led. At the hearing on Ms. Jernigan's trial in this case, SA Richard also testified to additional evidence, not presented at Jernigan's initial trial, that he asserted demonstrated that his failure to disclose was not material to Jernigan's conviction. As has been reviewed at some length above, however, that testimony was false in virtually all of its material respects, and SA Richard was the only witness to testify at the hearing.

In his order denying a new trial, the trial judge based his decision on his application of *Perkins* to the facts presented. Citing *Perkins*, the trial judge ruled that the November 2000 bank robberies "would not have been admissible in this case," given the lack of any sufficiently identifying similarities "that could connect the September 2000 robbery with those in November 2000." In his order, the trial judge never discussed the striking similarities in detailed physical descriptions between the perpetrators, the similar getaway vehicle, the general proximity of the robberies, or the clothing of the perpetrator.[27] In making his analysis, the trial judge only mentioned the lack of meaningful identifying features in the perpetrator's modus operandi, namely "the lack of any 'peculiar, unique, or bizarre conduct'" occurring during the robberies themselves. This omission, while curious on its face, is more understandable in light of SA Richard's tainted testimony, which would have given the trial judge a false sense of security that the similarities in the physical descriptions were not meaningful, because otherwise clear distinctions established the existence of two separate perpetrators, and other non-existent evidence demonstrated that the perpetrator of the first

---

[27] Further, unlike the situation in *Perkins*, Ms. Jernigan, at the time of her trial, was still charged with committing other similar bank robberies which bore additional striking similarities to the November 2000 crimes which Ms. Jernigan could not have committed. Similarities between the crimes that Ms. Jernigan could not have committed and the crimes with which Ms. Jernigan was contemporaneously charged, would have served, unlike the fact pattern in *Perkins,* to further exonerate her.

robbery was Rachel Jernigan.

To the extent that the trial judge's materiality determinations were unavoidably tainted by the false testimony of SA Richard, so are the determinations by the various appellate judges who thought that the withheld evidence was not material. The dissent in *Jernigan II* was based on the assertion that the Court should not review *de novo* a trial court's *Brady* determination. 492 F.3d 1050, 1064 (9th Cir. 2007) (Bea, J. dissenting). Rather, the dissent opined, deference should be given to a trial court's determinations when those determinations are supported by adequate evidence. *Id*. In reviewing the evidence on which the trial judge made its *Brady* determination, the dissent explicitly referred to SA Richard's testimony at the hearing on the motion for new trial:

> Agent Kyle Richard, the bank robbery coordinator at the Federal Bureau of Investigation's Phoenix division, was the case agent for all five bank robberies. Agent Richard determined the bank robberies in September and October were not committed by the same woman who committed the bank robberies in November. This determination was based on comparisons of the modus operandi, witness statements, and a photograph of Ms. Jernigan with photographs taken from the surveillance video of the November robberies. Owing to his determination, Agent Richard did not inform the Assistant United States Attorney prosecuting Ms. Jernigan's case of the November robberies.

*Id*. at 1064. The *en banc* dissent is also, therefore, inevitably tainted by SA Richard's false testimony.

The original panel decision that affirmed the trial judge's order conducted its own *de novo* review of whether the withheld exculpatory evidence was material. However, since the appellate panel's *de novo* review was based on the same factual record that the trial judge had, it too was tainted by a SA Richard's testimony, which included materially false statements, failed to include specific resemblances between the perpetrators of the robberies, and described distinctions between the perpetrators that either did not exist or were not reasonably drawn. SA Richard's testimony therefore provided a false sense of security that there were actually separate perpetrators. Furthermore, his testimony may have also prevented the trial judge and the appellate judges in the ultimate minority from adequately considering whether additional evidence arising from the later two bank robberies would have served to exculpate Ms. Jernigan.

For example, both the trial judge and the original panel majority in *Jernigan I* relied on the strength of Elizabeth Chlupsa's identification of Jernigan as the perpetrator of robbery one in determining that information concerning the additional robberies was not materially exculpatory. SA Richard never showed Ms. Chlupsa a surveillance photo of the perpetrator of robbery four prior to trial, nor after the arrest of Juanita Rodriguez-Gallegos did he show a six-pack photo array containing a photograph of Ms. Rodriguez-Gallegos to any of the victims of robberies one through three.

Presumably, however, had trial counsel been made timely aware of robberies four and five, he would have procured and shown the surveillance photo of robbery four to Ms. Chlupsa, and/or to the jury at trial. It is at least somewhat telling that Plaintiff in this action has since shown to Ms. Chlupsa the booking photo of Juanita Rodriguez-Gallegos. Upon review of that photo Ms. Chlupsa no longer believes that she was robbed by Ms. Jernigan. She further believes that Ms. Rodriguez-Gallegos closely resembles the person who robbed her, and the photo of Ms. Rodriguez-Gallegos is consistent with the description that Ms. Chlupsa gave to police on the day she was robbed. (Doc. 130-2, Ex. 10).

Even after Ms. Jernigan's conviction, if she had been made aware of Ms. Rodriguez-Gallegos's arrest for robbery six and subsequent admission in the plea agreement to robberies four and five, defense counsel could have determined if any of the victims of the first three robberies would have identified Ms. Rodriguez-Gallegos as their perpetrator. Even if SA Richard did not realize the strong link between robberies two and five sufficient to pursue the matter, defense counsel would have presumably done so for its exculpatory value and further understood that, under these circumstances, Ms. Ward's potential identification of Rodriguez-Gallegos would have tended to exonerate Ms. Jernigan.[28]

---

[28] Because Ms. Rodriguez-Gallegos was identified as the perpetrator of robbery five, because robbery two was linked to robbery five by witnesses to both robberies who not only gave a similar physical description of the perpetrator but gave the same description of the getaway vehicle, because both the FBI and Kerry Ward, the teller in robbery two, thought that robberies one and two were committed by the same person, and because Kerry Ward did not identify Rachel Jernigan as that person, Rodriguez-Gallegos's arrest was exculpatory for

Further, additional similarities in the unique aspects of the descriptions of the perpetrators of the crimes could have been identified by defense counsel, if not by SA Richard, had such crimes been disclosed. For example, as has been set forth above, a description by independent witnesses to robbery two and robbery four described the perpetrators face as being stretched "like she just woke up." Such a physical description is unusual and distinctive. Given the other physical similarities of the described perpetrators it would have provided additional exoneration for Ms. Jernigan.

It is true that four additional witnesses identified Ms. Jernigan as the perpetrator at her trial and, in addition, the trial judge offered two additional reasons for finding the exculpatory evidence immaterial. Nevertheless, absent SA Richard's false testimony, none of this evidence is sufficient together, or in concert, to have supported a finding by any of the dissenting judges that the failure to disclose the subsequent similar robberies was not material to Jernigan's conviction.

The additional four witnesses who identified Rachel Jernigan at trial, Nath, Golliher, Grierson and Hawley, were first shown the six-pack photo array containing Ms. Jernigan five to six months after the robbery and shortly before Ms. Jernigan's trial. As the Ninth Circuit has already observed, "[t]his delay, which goes totally unexplained, also detracts from the reliability of the identifications." *Jernigan II*, 492 F.3d at 1056. Further, *none* of the witnesses, with the possible exception of Ms. Hawley, had much of a chance to view the perpetrator of the crime as it was being committed. In such circumstances such identification does not meet many, if any, of the indicia of reliability set forth in *Grant*. "Indicia of reliability include: 1) the opportunity to view the criminal at the time of the crime; 2) the degree of attention paid to the criminal; 3) the accuracy of the prior descriptions of the criminal; 4) the level of certainty demonstrated at the time of the confrontation; and 5) the length of time between the crime and the confrontation." *Grant*, 315 F.3d at 1087. Further, none of the other witnesses, insofar as the Court is aware, has been shown a photograph of

Jernigan.

Ms. Rodriguez-Gallegos. Because Ms. Chlupsa changed her mind about her identification when she saw the photo, some or all of the other witnesses may well have done so had they been given the opportunity.

Second, Kathleen Golliher, who had been present at the bank during the first robbery, was actually the teller/victim robbed in robbery six. After the motion for new trial was filed but prior to the hearing on the motion, SA Richard obtained a written statement from Ms. Golliher that the perpetrators of robbery one and robbery six were different. (Doc. 97-7, Ex. HH; Doc. 97-3 Ex. G at S-B-O 3776). Although Ms. Golliher had made no such statements at the time of Rodriguez-Gallegos's arrest, and thus such a statement could not have been a basis for withholding disclosure of Rodriguez-Gallegos's arrest from the Defendant, the statement was admitted in evidence at the hearing on the motion for new trial without objection.

Nevertheless, by her own admission Ms. Golliher did not get a good look at the perpetrator of robbery one. She only saw her momentarily from the back or side as the perpetrator was fleeing the bank. To the extent that she was able nevertheless to give police a description at the scene, it matches, almost exactly, the description she gave police of the perpetrator at the scene of robbery six. However, in the statement she prepared more than two and a half years after robbery six at the request of SA Richard, she contrasts the description of the two perpetrators in a way that is not consistent with the descriptions she gave police at the scenes.[29] Thus, her much later statement did not meet the *Grant* criteria and would not have provided, either alone or in concert with other evidence, a sufficient basis on which a

---

[29] In her contemporaneous statement after robbery one, Ms. Golliher described the first robber as a "small [M]exican adult female who was in her thirties, 5'0" 110 lbs, wearing a denim hat and denim vest." (Doc. 97-2, Ex. A at TOG000109). Similarly, at the scene of robbery six, Ms. Golliher described the second robber as being a small thirty-year-old female who was five feet tall. (Doc. 97-5, Ex. L at KR-1064).

In her 2004 statement made at SA Richard's request, she revised those descriptions, describing the first robber as being about 38 to 40, and the second robber being in her 20's. She described the first robber as five feet and the second five feet two inches. (Doc. 97-7, Ex. HH; Doc. 97-5, Ex. L at KR-1064).

reasonable judge would find the subsequent similar convictions immaterial absent the false testimony of SA Richard.

Finally, the trial judge noted in his order that "the robber shown in the November 2000 bank robberies surveillance films does not look like the person shown in September 2000 surveillance photos." Of course, the trial judge made that statement after looking at the respective booking photos of Rachel Jernigan and Juanita Rodriguez-Gallegos that were also admitted into evidence at the hearing, and after having heard SA Richards' false testimony about why there was a "consensus" that there were two different perpetrators. Further, the trial judge does not say in that statement that he definitively concludes that the two perpetrators depicted in the surveillance photos of the two robberies were different persons, he merely stated that "they did not look like the same person." Of course, had the appropriate disclosure in this case been made, those surveillance photos would not have been compared by the trial judge. They would have been compared by the prosecutor, the witnesses for the prosecution, the victims of other robberies for which Ms. Jernigan was under charge, and ultimately, if necessary, the jurors whose job it would have been to determine whether the persons depicted were the same or could have been different. Equivocation as to whether they could have been the same person on the part of any one of those other persons presented a reasonable probability that Ms. Jernigan might not have been convicted for robbery one. It is, of course, more appropriate for prosecutors, witnesses and jurors to make such evaluations in the process of determining guilt, than it is the trial judge to consider them in the process of determining materiality to a previous conviction.

Upon analysis it appears that the trial court and the reviewing courts relied on SA Richard's testimony in coming to the conclusion that his failure to disclose exculpatory evidence was not material to Ms. Jernigan's conviction. At any rate it is impossible to come to the conclusion that they did not rely on SA Richard's testimony. That likely erroneous reliance alone is a sufficient basis on which to distinguish this case from the *Pearson* and *Wilson* line of cases. Judicial disagreement about whether a *Brady* obligation exists that is based, at least in part, on crediting the sworn testimony of a Defendant that later turns out to

1    be unsupportable cannot be a basis for that Defendant, or other Defendants, to escape § 1983

2    liability.[30]

3    **IV.    Civil Liability**

4         Defendant Richard also asserts that Ms. Jernigan's right to receive exculpatory

5    evidence was not clearly established because, while it has been clear since 1963 that

6    investigators must turn over exculpatory evidence to the defense, it was not clear until 2009

7    when the Ninth Circuit decided *Tennison,* 570 F.3d at 1078, that an investigator could be held

8    civilly liable for violating *Brady*. This argument fails because whether a constitutional right

9    is clearly established is a separate question from whether it is clearly established that a

10   government agent who breaches a clearly established constitutional right can be held civilly

11   liable for the breach. The latter inquiry is not a part of the qualified immunity analysis.

12   **V.    Unclear Extent of Disclosure Obligation**

13        Detective Brock and Sergeant McLaws argue that, once it was clear that the

14   prosecution, if any, would be for a federal crime, the Gilbert Police Department's role was

15   limited to assisting the FBI in its investigation. They therefore argue that they had no clearly

16   _____

17   [30] The Court recognizes that the standards applicable to a motion for summary
18   judgment in a civil proceeding which require the Court to treat SA Richard's previous
     testimony as false may, for good reasons, not be binding in other proceedings. In light of the
19   importance of precise, cautious and truthful testimony to the operation of the federal criminal
20   justice system, however, and what appears to be the lack of such testimony both in this
     matter and at Ms. Jernigan's hearing on her motion for new trial in May 2004, the Court
21   orders that a copy of this order on summary judgment be transmitted to the Department of
     Justice's Office of Professional Responsibility ("OPR"). It requests the OPR to determine
22   independently whether SA Richard's testimony at (1) Ms. Jernigan's hearing on her motion
     for new trial on May 12-13, 2004, (2) his declaration under penalty of perjury dated
23   November 30, 2010 and filed in this matter at Doc. 145-2, Ex. A, specifically ¶ 12; and (3)
24   his declaration under penalty of perjury dated January 24, 2011 and filed in this matter at
     Doc. 162-2, specifically ¶ 12, comply with the ethical standards of the Department of Justice.
25   The Court further refers the question whether additional non-administrative action is merited
     against SA Richard in light of his sworn statements. This second question is also referred to
26   the OPR in light of the recusal by the United States Attorney for the District of Arizona from
27   this matter and the representation of SA Richard by the United States Attorney for the
     Central District of California. Should a further referral of this question by the OPR be
28   necessary to implement the Court's referral, it is, of course, authorized.

established obligation to disclose exculpatory information to the federal prosecutor or to Defendant. They needed only to disclose such information to Defendant Richard or his superiors at the FBI.

SA Richard asserts that the municipal police are jointly responsible for any investigation of bank robberies within their jurisdiction even if the suspects will be subject to federal charges. Further, the law does specify that "[a] prosecutor's duty under *Brady* necessarily requires cooperation of other government agents who might possess *Brady* material." *United States v. Blanco,* 392 F.3d 382, 388 (9th Cir. 2004). Furthermore, exculpatory evidence cannot be kept out of the hands of the prosecutor just because the prosecutor does not have it, when an investigating agent does. *United States v. Zuno-Arce,* 44 F.3d 1420, 1427 (9th Cir. 1995).

But, in ruling on this motion for summary judgment, the Court need not determine whether the Town's police officers had a clearly established obligation to disclose exculpatory material directly to the federal prosecutor or to a defendant in a federal case under the circumstances presented here. Defendants do not contest that they had a clear obligation, at the least, to disclose to SA Richard or his superiors at the FBI exculpatory information of which they were aware. Detective Brock apparently acknowledged such an obligation during deposition. (Doc. 97-2, Ex. C at 82). At oral argument on the motion, Sergeant McLaws took the position that if he believed there was exculpatory information with respect to Ms. Jernigan that SA Richard had ignored, he should have raised the matter with SA Richard or his supervisors. Yet, there is no admissible evidence submitted in conjunction with the briefing on the respective motions that either did so. Therefore, they are not entitled to summary judgment on Ms. Jernigan's *Brady* claims.

Detective Brock and Sergeant McLaws further argue that, because SA Richard knew, if anything, considerably more about the scope of the exculpatory facts than they knew, their disclosure of such facts to SA Richard would have served no purpose; he still would not have disclosed those facts to the prosecutor. Nevertheless, it is the realm of the jury to decide whether SA Richard would have acted differently if either Sergeant McLaws or Detective

Brock would have independently raised the distinctive similarities to his attention. "[M]any factors or things or the conduct of two or more persons can operate at the same time either independently or together to cause injury or damage and in such a case each may be a proximate cause." *Jones v. Williams,* 297 F.3d 930, 937 n. 6 (9th Cir. 2002).

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986). In this case, as a matter of law, SA Richard is not entitled to qualified immunity. He was either plainly incompetent or he knowingly violated the law. Under the circumstances no reasonable officer would have believed that he was acting appropriately with respect to Ms. Jernigan's rights by withholding the information concerning the subsequent robberies from her. Further, no reasonable officer would have misstated the facts to the same extent as did SA Richard in his testimony at the hearing on Ms. Jernigan's motion for new trial. SA Richard is, therefore, as a matter of law, not entitled to the defense of qualified immunity.

With respect to Detective Brock and Sergeant McLaws, there are issues of fact which must be determined by a fact finder before it can be determined whether those Defendants are entitled to qualified immunity. Thus to the extent Brock and McLaws seek summary judgment on the § 1983 *Brady* claims against them, their motion is denied.

### A. The Malicious Prosecution Claims

#### 1. The Original Indictment

To prevail on their assertion that Defendants lacked probable cause to arrest Plaintiff because the six-pack photo lineup was overly suggestive, Plaintiff first must establish that the officers employed "an identification procedure so impermissibly suggestive as to give rise to a substantial likelihood of misidentification." *Grant,* 315 F.3d at 1086. Even then, however, if the witness demonstrates sufficient indicia of the reliability of his or her identification, the identification may still provide probable cause for arrest. *Id.*

In *Grant,* the court refused to find probable cause existed to justify the arrest of the plaintiff when two eyewitness/victims identified him from a six-pack lineup card as their attacker. Although both women at least tentatively identified the plaintiff's photo as their

attacker from the six-pack, they had identified other suspects from previous six-packs. Furthermore, the other seven of the then nine victims did not feel sufficiently confident after reviewing the six-pack to make a positive identification from the photo spread. The Court held that the identification procedures used by the officers were suggestive because Grant was the only Caucasian featured in the photo spread. *Id.* at 1088. The other potential suspects featured were all Hispanics. *Id.* Further, none of the other suspects in the six-pack shared his general facial characteristics. *Id.* at 1087. Finally, the two witnesses were not shown the six-pack featuring Grant until three to four months after their assaults, and neither had much time or unobstructed opportunity to view the original perpetrator of the offenses against them. *Grant*, 315 F.3d at 1084–85. Thus, the witnesses' identification of Grant from the six-pack did not provide probable cause to arrest him.

Similar problems, however, were not present with respect to the investigation leading to the first indictment in this case. Unlike the six-pack at issue in *Grant*, the other persons featured on the line-up card with Ms. Jernigan generally appear to be of Ms. Jernigan's approximate race, age and general appearance. Richard and Brock showed the six-pack to Ms. Chlupsa two days after the robbery occurred. At that time Ms. Chlupsa expressed some considerable degree of confidence that Ms. Jernigan was the person who robbed her. Ms. Chlupsa had not previously identified other perpetrators from other photo arrays. Further, Ms. Chlupsa was the witness with the single greatest and unobstructed exposure to the perpetrator, and her identification met the reliability standards set forth in *Neil v. Biggers,* 409 U.S. 188 (1972) and *United States v. Gregory,* 891 F.2d 732, 734–35 (9th Cir. 1989).

With respect to the Ms. Chlupsa's identification of Ms. Jernigan, therefore, the identification procedure used was not unduly suggestive. Even if it might have had some suggestive aspects, Ms. Chlupsa's identification bore sufficient indicia of reliability to create probable cause justifying the arrest of Ms. Jernigan for robbery one. *Ewing v. City of Stockton,* 588 F.3d 1218 (9th Cir. 2009) (holding that despite two false statements in a warrant application, a reliable source's identification of the plaintiff at the scene was sufficient to establish probable cause). *See also Smith,* 640 F.3d at 937 (holding that "in a garden-variety

false arrest claim challenging the probable cause for an arrest, if the arrest warrant is facially valid, the arresting officer enjoys qualified immunity"). Further, "probable cause exists where under the totality of the circumstances known to the officer, a prudent person would have concluded that there was a fair probability that the suspect had committed or was committing a crime." *United States v. Noster,* 590 F.3d 624, 629-30 (9th Cir. 2009).

Based on Ms. Chlupsa's identification, the United States Attorney's office filed a complaint against Ms. Jernigan on September 25, 2000 and obtained an indictment against her from a federal grand jury on October 11, 2000. Ms. Jernigan was subsequently arrested on November 10, 2000.

Plaintiff does not suggest that anyone withheld available evidence from the prosecutor up to and through the time that Ms. Jernigan was initially arrested. Thus Defendants are entitled to summary judgment on Plaintiff's malicious prosecution claims to the extent that they are based on Defendant's initial arrest for robbery one.

### 2.     The Superceding Indictment

On January 2, 2001, SA Richard testified before the United States Grand Jury to obtain a superceding indictment against Ms. Jernigan. He did so after becoming aware of robbery four and robbery five, but, as is uncontested, he did not disclose this information to the federal prosecutor, the grand jury or anyone else. The grand jury issued the superceding indictment. It added three counts—an additional count alleging that Ms. Jernigan used a firearm during the first robbery, (count two), an additional count charging that Ms. Jernigan committed robbery two (count three) and an additional count that Ms. Jernigan committed robbery three (count four).

Even given the similarities in the five robberies as a whole, based on the eyewitness identification of Ms. Chlupsa (robbery one), and Ms. Etherington (robbery three) of Rachel Jernigan as the perpetrator of those robberies, there was either probable cause to believe that Jernigan had committed robberies one and three, or a reasonable agent could have believed that there was independent probable cause. *Ewing,* 588 F.3d at 1218.

Even though robbery four and five provided "sufficient" distinctive indicia to connect

them with robberies one, two and three, and thus they should have been disclosed pursuant to *Brady*, nothing about robbery four and five was necessarily sufficient in and of itself to destroy the probable cause to continue the detention of Jernigan that arose from Ms. Chlupsa's identification of Ms. Jernigan for robbery one, or Ms. Etherington's identification of Ms. Jernigan for robbery three. Nor is SA Richard under an affirmative obligation to destroy any probable cause that he may have established with respect to Ms. Jernigan, so long as he has otherwise complied with his *Brady* obligations.

This same reasoning, however, does not apply to count three (robbery two) of the superceding indictment. In contrast to robberies one and three, no witness to robbery two identified Jernigan as the perpetrator. To the contrary, when Kerry Ward was shown the six-pack photo array containing Rachel Jernigan, she could not identify the perpetrator of robbery two from that line-up. Presumably, the only basis on which count three of the superceding indictment could have issued was, therefore, the similarity of robbery two to robberies one and three, and the affirmative identification of Jernigan as the perpetrator of robberies one and three. Nevertheless, when similar robberies four and five occurred after Ms. Jernigan was already in custody, any probable cause that arose because of the similarities between robbery two and robberies one and three dissipated. There was thus no other eyewitness identification providing probable cause justifying the charge. SA Richard was aware of the similarities in the subsequent robberies to robbery two and he nevertheless did not disclose that information to the prosecutor or the jury. Thus, the ultimate issuance by the grand jury of the superceding indictment does not preclude a malicious prosecution claim against him.

> Ordinarily, the decision to file a criminal complaint is presumed to result from an independent determination of the prosecutor, and thus precludes liability [for a § 1983 malicious prosecution claim] for those who participated in the investigation . . . that resulted in initiation of proceedings. *The presumption of prosecutorial independence does not bar a subsequent § 1983 against . . . officials who . . . concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings.*

*Awabdy v. City of Adelanto,* 368 F.3d 1062, 1067 (9th Cir. 2004) (emphasis added).

The Court is aware that, at the time that the superceding indictment was issued, Mrs.

Jernigan was already in custody on the original indictment and that, after she was convicted of the initial counts in the superceding indictment, the remaining charges relating to robberies two and three were dismissed without prejudice. Therefore, because prior to the superceding indictment Ms. Jernigan was already in custody, and after her conviction remained in custody on charges for which there was probable cause to arrest her, there may be an issue as to causation of damages resulting from count three. Nevertheless, as to causation "[M]any factors or things or the conduct of two or more persons can operate at the same time either independently or together to cause injury or damage and in such a case each may be a proximate cause." *Jones v. Williams,* 297 F.3d 930, 937 n. 6 (9th Cir. 2002). The parties have not briefed the issue and the Court is disinclined to grant summary judgment in the absence of it being addressed.

While Plaintiff's malicious prosecution claim against SA Richard survives summary judgment as it pertains to count three of the superceding indictment (robbery two), she has demonstrated no such claim against either Sergeant McLaws, or Detective Brock. To state such a claim Plaintiff must show that "defendants prosecuted her with malice and without probable cause, and that they did so for the purpose of denying her equal protection or another specific constitutional right." *Id.* at 1066 (quoting *Freeman v, City of Santa Ana,* 68 F.3d 1180, 1189 (9th Cir. 1995)). As *Awabdy* further notes, "[m]alicious prosecution actions are not limited to suits against prosecutors but may be brought, as here, against other persons who have wrongfully caused the charges to be filed." *Id.* (citing *Galbraith v. County of Santa Clara,* 307 F.3d 1119, 1126–27 (9th Cir. 2002)).

Thus, to maintain her § 1983 claim against Sergeant McLaws and/or Detective Brock, Plaintiff is obliged to bring forth some evidence raising an issue of fact as to whether either of them "wrongfully caused the charges to be filed." This she has failed to do. Robbery two occurred in Tempe; neither McLaws nor Brock are Tempe police officers and neither sought any charge against her for the Tempe bank robbery. Therefore, while SA Richard is not entitled to summary judgment on Ms. Jernigan's claim for malicious prosecution at least as it pertains to count three of the superceding indictment, Sereant McLaws and Detective Brock are so

entitled.

The analysis for the state law malicious prosecution claim is largely identical. *See Slade v. City of Phoenix,* 112 Ariz. 298, 300, 541 P.2d 550, 552 (1975). "The essential elements of malicious prosecution are (1) a criminal prosecution, (2) that terminates in favor of plaintiff, (3) with defendants as prosecutors, (4) actuated by malice, (5) without probable cause, and (6) causing damages." *Id.* Just as with the § 1983 malicious prosecution claims, probable cause to institute a proceeding against a plaintiff "constitute[s] a complete and absolute defense to an action for malicious prosecution." *Frey v. Stoneman,* 150 Ariz. 106, 109, 722 P.2d 274, 277 (1986). Thus, the probable cause for the arrests resulting from the eyewitness identifications of Elizabeth Chlupsa, and Colette Etherington bar a claim against any Defendant for malicious prosecution. There is, thus, no malicious prosecution claim as to counts one, two, or four of the indictment. Although Plaintiff may not be able to demonstrate that she suffered damage as a result of count three of the superceding indictment, no party has briefed the issue, thus there remains a claim for malicious prosecution against SA Richard on count three. Because there is no evidence that Sergeant McLaws, or Detective Brock instigated or had any role in prosecution on count three of the superceding indictment, they are entitled to summary judgment on the state law claim as is the Town of Gilbert.

**VI.   Ms. Jernigan's Motion For Summary Judgment**

Ms. Jernigan's summary judgment motion against the Defendants is also granted in part and denied in part. It is granted to the extent that it seeks a judgment that SA Richard is not entitled to invoke a qualified immunity defense to Ms. Jernigan's claims against him for *Brady* violations and for malicious prosecution. To the extent Plaintiff seeks summary judgment that Brock and McLaws are not entitled to qualified immunity, the motion is denied due to issues of material fact. Issues of fact also remain as to the other elements of Plaintiff's *Bivens* and § 1983 claims against Defendants. Therefore, the remainder of Plaintiff's motion for summary judgment is denied.

**IT IS THEREFORE ORDERED:**

1.      Granting in part, and denying in part, the Gilbert Defendants' Motion for

Summary Judgment. (Doc. 96). The motion is granted to the extent that it seeks summary judgment on any state or federal claims for malicious prosecution against any of the Gilbert Defendants. It is also granted to the extent it seeks summary judgment on behalf of Defendant David Landgraf as to any and all claims of the complaint. The motion is denied to the extent that it seeks summary judgment on the *Brady* claims against Detective Brock and Sergeant McLaws.

2.     Granting in part, and denying in part, Defendant Kyle Richard's Motion for Summary Judgment. (Doc. 145). The motion is granted to the extent that the complaint asserts a *Bivens* malicious prosecution claim against SA Richard arising from Plaintiff's initial arrest, detention and prosecution for the September 20, 2000 bank robbery, (the original indictment, or counts one and two of the superceding indictment) or the October 25, 2000 bank robbery (count four of the superceding indictment). The Court denies the Motion as it relates to all other claims asserted by Plaintiff against SA Richard.

3.     Granting in part and denying in part the Motion for Partial Summary Judgment by Rachel Jernigan. (Doc. 152). The motion is granted only to the extent that it seeks a determination that Defendant Kyle Richard is not entitled to qualified immunity for any of the claims asserted against him. The motion is denied in all other aspects.

4.     The Court grants Plaintiff's request to Disregard the Town Defendant's Response. (Doc. 172).

5.     A copy of this Order on summary judgment is to be transmitted to the Department of Justice's Office of Professional Responsibility ("OPR"). The Court requests the OPR to determine independently whether SA Richard's testimony at (1) Ms. Jernigan's hearing on her motion for new trial on May 12-13, 2004, (2) his declaration under penalty of perjury dated November 30, 2010 and filed in this matter at Doc. 145-2, Ex. A, specifically ¶ 12; and (3) his declaration under penalty of perjury dated January 24, 2011 and filed in this matter at Doc 162-2, specifically ¶ 12, comply with the ethical standards of the Department of Justice. The Court further refers to the OPR the question whether additional non-administrative action is merited against SA Richard in light of his sworn statements. This second question is

referred to the OPR in light of the recusal by the United States Attorney for the District of Arizona from this matter and the representation of SA Richard by the United States Attorney for the Central District of California. Should a further referral of this question by the OPR be necessary to implement the Court's referral, nothing about this Court's referral prevents such an additional referral.

DATED this 11th day of January, 2012.

G. Murray Snow
United States District Judge